Docket No. 85332–Agenda 1–May 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. REGINALD CHAPMAN, Appellant.

Opinion filed December 1, 2000.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Reginald Chapman, was charged in the circuit court of Cook County with six counts of first degree murder, two counts of aggravated kidnapping, and two counts of concealment of a homicidal death. These charges related to the August 1994, murders of Angela Butler and Christopher Butler. The State nol-prossed the aggravated kidnapping counts, the concealment of a homicidal death counts, and the two felony-murder counts. The jury returned separate general verdicts of guilty against defendant for the first degree murder of Angela Butler and the first degree murder of Christopher Butler.

The same jury found defendant eligible for the death penalty based upon the following two statutory aggravating factors: that the defendant murdered two or more individuals (720 ILCS 5/9–1(b)(3) (West 1998)); and that the defendant murdered an individual who was under 12 years of age, and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (720 ILCS 5/9–1(b)(7) (West 1998)). Defendant waived a jury for the second phase of the death sentencing hearing. After considering evidence in aggravation and mitigation, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death.

Defendant’s death sentence has been stayed pending direct review by this court. See Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant’s convictions and death sentence.

FACTS

The evidence at trial revealed that on September 4, 1994, a body was reported to be floating in the water in the Calumet Sag Channel in Alsip, Illinois. The Illinois State Police underwater search and recovery team and members of the criminal investigations unit were dispatched to the scene. When dive team members recovered the body, it was floating face down, and it was wrapped in orange and black electrical cord. The cord was attached to two free weights, one weighing 50 pounds, and the other weighing 25 pounds. The body was bloated, discolored, and decomposed from being in the water.

Investigators determined that the victim was Angela Butler. The police interviewed Georgia Anderson, Angela’s grandmother, who told the investigators that Angela had a five-month-old son, Christopher Butler, and that Angela had been living with the family of her fiancé, Louis Murillo. Angela’s parents lived in Israel, which is where Angela had been raised. Angela had only lived in Chicago, where her grandmother lived, for a few years. Angela’s grandmother informed the police that Angela had been missing since August 27, 1994, and that a missing persons report had been filed with the Chicago police department on August 31, 1994.

Testimony revealed that Angela’s relationship with Murillo began soon after she moved to Chicago and lasted for a year and a half. After Angela ended the relationship, she began to date defendant, and they lived together for several months. On April 9, 1994, Angela gave birth to defendant’s child, Christopher Butler. Their relationship ended soon after. Angela and Murillo then resumed their relationship and became engaged in June 1994, and Angela moved in with the Murillo family. At the end of August 1994, Murillo returned to college in Iowa. Angela planned to move to Iowa in October to live with Murillo.

Curtis Taylor, Murillo’s brother, testified that on August 27, 1994, he, Angela, and other members of Murillo’s family planned to attend a birthday party. At approximately 3 p.m., they stopped at a Dominicks grocery store to buy a cake. Angela and Taylor remained in the car. Angela’s son, Christopher, was also with them and remained in the car. As they were waiting in the car, defendant approached, knocked on the window, and motioned for Angela to exit. Angela asked defendant what he was doing there. Defendant asked to see Christopher, stating that he had not seen him in over a week. After Angela gave the baby to defendant, they walked to defendant’s car, where defendant shoved Angela into his car. Taylor went over to defendant’s car and asked Angela where she was going. Angela responded that she was going for a ride and that she would be back in a few minutes. According to Taylor, Angela seemed frightened, and defendant seemed angry and upset.

When Taylor returned to his car, he realized that Angela had left the baby’s diaper bag in the car. When the other family members returned from the grocery store, they waited for 10 minutes for Angela to return. When they reached the birthday party, Taylor unsuccessfully attempted to telephone Angela. Testimony revealed that Taylor identified defendant in a lineup as the person he saw with Angela and Christopher on August 27, 1994.

Testimony from police officers revealed that, on Friday, September 9, 1994, at approximately 7 a.m., pursuant to the ongoing investigation into the murder of Angela and the disappearance of Christopher, officers arrived at defendant’s apartment and knocked on the door. Defendant was in the apartment with his girlfriend, Tiffany Brownlee, and Tiffany’s 18-month-old son, Jeremy. A police officer read defendant his constitutional rights pursuant to 
Miranda
, and defendant waived these rights. Defendant also signed a consent to search his apartment and his car.

The police subsequently took defendant to the Illinois State Police station at 83rd and King Drive. At around 9:15 a.m., Officers Robert Amenitsch and Officer Kizart interviewed defendant for approximately 45 minutes after again advising defendant of his 
Miranda
 rights. Defendant stated that he did not recall the last time he saw Angela. Defendant initially denied owning any weight-lifting equipment, but then told the officers that he had recently sold his weight-lifting equipment to an individual named “Foy.” Defendant subsequently told the officers that he had given the weight-lifting equipment to his brother. As we will discuss in detail later, throughout the course of that Friday, authorities interviewed defendant, but when they asked defendant if he knew the location of Angela and Christopher, he began to cry, and the interviews were terminated.

The next morning, Saturday, September 10, 1994, at approximately 11:30 a.m. to 12:30 p.m., defendant, after waiving his 
Miranda
 rights, made a statement to Assistant State’s Attorney Pierre Tismo. Tismo testified that defendant admitted that he had spoken to Angela on August 27, 1994, at the grocery store parking lot. Defendant stated that they met to talk about Angela’s upcoming move to Iowa. Defendant said that he, Angela, and Christopher drove in his car to defendant’s apartment, where defendant and Angela argued. Defendant stated that he hit Angela with his open hand, with his fist, and with a baseball bat. When Tismo asked how Angela’s body ended up in the Calumet Sag Channel, defendant responded that he put her there. When asked where Christopher was, defendant put his head down and cried, yet he stated that authorities could find Christopher where they found Angela. On September 12, 1994, Christopher’s decomposed body was recovered from the Calumet Sag Channel. Christopher’s body was tied with orange electrical cords to 40 pounds of weights.

Tiffany Brownlee testified that she was with defendant early in the day on August 27, 1994, the day the victims disappeared. She woke up with defendant at his apartment that morning. Later, they went to defendant’s mother’s house. They were watching television when defendant received a telephone call. He left and said that he would be right back. Tiffany left and went to her mother’s house at around 5:30 p.m. after waiting for 1½ hours for defendant to return. She spent the night at her mother’s house.

Tiffany saw defendant the next day, on August 28, 1994. Defendant picked her up in his car, and they went to defendant’s mother’s house. While they were there, Tiffany saw defendant clean out the trunk of his car. When they returned to defendant’s apartment that evening, she noticed that it was in disarray and that certain items were missing. Among the missing items were a long orange electrical cord that connected the television to an electrical outlet. Also missing was defendant’s weight-lifting equipment. When shown the photographs of the electrical cords and weights that were found on the victims, Tiffany identified those items as the same items that were missing from defendant’s apartment. Tiffany also testified about the events of Friday morning, September 9, 1994, when the police arrived at defendant’s apartment. Before defendant opened the door and allowed the officers into his apartment, defendant told Tiffany to tell the police that he had “been with you [Tiffany].”

Crime scene investigator Dexter Bartlett testified regarding his search of defendant’s car. There was a contact blood smear on the rubber weather strip in the trunk of defendant’s car. Bartlett recovered a pair of infant gym shoes from the trunk. These shoes had blood splatters on them. Bartlett testified that the blood splatters on the shoes appeared to have hit the shoes at a 90-degree angle. Crime scene investigator Paul Smith testified regarding his search of defendant’s apartment. Smith recovered several items, including a blanket that had bloodstains on it and a baseball bat. Later testing revealed that the DNA extracted from the bloodstains on the infant shoes and on the blanket matched the DNA of Angela.

Dr. Adrienne Segovia, a forensic pathologist, testified regarding the autopsies of Angela and Christopher. On the back of Angela’s head, there was a one-inch laceration that indicated some type of blunt force trauma. Underneath the laceration, between the scalp and the skull, there was evidence of a hemorrhage. According to Dr. Segovia, this meant that Angela was alive at the time she sustained the laceration because bleeding occurred. The examination also revealed that the right hyoid bone of Angela’s neck was fractured. This injury was consistent with manual strangulation. Dr. Segovia testified that Angela’s body had been in the water for several days. Dr. Segovia concluded that the cause of Angela’s death was strangulation.

Dr. Segovia also testified regarding the autopsy of Christopher. Christopher’s body likewise had been in the water for several days and was severely decomposed. Portions of Christopher’s head and arms were missing, and his body showed indications of “aquatic animal activity.” The medical examiners’ opinion was that the cause of Christopher’s death was suffocation; yet, because of the decomposed state of Christopher’s body from the water, the manner of suffocation was inconclusive.

The jury returned separate general verdicts of guilty against defendant for the first degree murder of Angela and the first degree murder of Christopher. Prior to the sentencing hearing, the trial court merged the knowledge counts into the intent counts and entered judgment of first degree intentional murder as to Angela and first degree intentional murder as to Christopher. At the first phase of the sentencing hearing, the jury found defendant eligible for the death penalty based upon the following two statutory aggravating factors: that the defendant murdered two or more individuals (720 ILCS 5/9–1(b)(3) (West 1998)); and that the defendant murdered an individual who was under 12 years of age, and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (720 ILCS 5/9–1(b)(7) (West 1998)). Defendant waived a jury for the second phase of the sentencing hearing. He also waived his right to be present during the second phase of the hearing. After considering evidence in aggravation and mitigation, evidence which we will later discuss in more detail, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death for the murders of Angela and Christopher.

The trial court denied defendant’s motion for a judgment notwithstanding the verdict or, alternatively, a new trial, and denied defendant’s motion to vacate the death sentence. The trial court also denied defendant’s 
pro se
 motion to set aside the jury verdict and for a new trial. Defendant now appeals his convictions and sentence.

ANALYSIS

I. Trial Issues

A.
 Motion to Suppress Statements

Defendant argues that the trial court erred in denying his motion to suppress statements he made to authorities. Defendant argues that the police interfered with his opportunity to consult with counsel prior to custodial interrogation and thereby violated his state constitutional right to due process (see Ill. Const. 1970, art. I, §2) and right against self-incrimination (see Ill. Const. 1970, art. I, §10). Defendant argues that the admission of these statements requires reversal of his conviction and a new trial. For the following reasons, we reject defendant’s argument.

Prior to trial, defendant filed a motion to suppress inculpatory statements he made to authorities. The trial court held a hearing on the motion to suppress at which the following evidence was presented. On Friday, September 9, 1994, at approximately 7 a.m., pursuant to the ongoing investigation into the murder of Angela Butler and disappearance of Christopher Butler, police officers arrived at defendant’s apartment. Defendant agreed to talk with the officers and allowed them entry into his apartment. Officer James Kizart read defendant his constitutional rights pursuant to 
Miranda
, and defendant waived these rights. Defendant talked with the officers and subsequently agreed to accompany them to the police station.

The police took defendant to the Illinois State Police station at 83rd and King Drive. At around 9:15 a.m., Officer Robert Amenitsch and Officer Kizart interviewed defendant for approximately 45 minutes after again advising defendant of his 
Miranda
 rights, which he waived. Defendant stated that he did not recall the last time he saw Angela. Defendant initially denied owning any weight-lifting equipment, but then told the officers that he had recently sold his weight-lifting equipment to an individual named “Foy.” Defendant subsequently told the officers that he had given the weight-lifting equipment to his brother.

At approximately 11 a.m. on Friday, September 9, 1994, Officer Kizart and Officer Carolyn Black interviewed defendant for about an hour after again advising defendant of his 
Miranda
 rights, which he again waived. The officers showed defendant pictures of Angela and Christopher and asked him if he knew where they were. Defendant responded that he did not know where they were but that they were together. When Officer Black showed defendant a picture of Angela’s body after it had been recovered from the Calumet Sag Channel, defendant began to sob, and the interview was terminated.

At approximately 2:15 p.m., Officer Tasso Kachiroubas and another officer spoke with defendant for about 15 minutes and asked defendant for more specific information regarding the location of Christopher’s body. Defendant did not say anything and began to cry. Officer Kachiroubas and an assistant State’s Attorney spoke with defendant for 15 minutes at about 8 p.m. that Friday. Officer Kachiroubas explained that divers were scheduled to begin a search for Christopher the next morning, and that authorities needed defendant’s assistance in determining a target area. Defendant began to sob, and the interview was terminated. Defendant waived his 
Miranda
 rights during these conversations.

At approximately 5:30 the next morning, Saturday, September 10, 1994, defendant was transferred from the Illinois State Police station on 83rd and King Drive to the Blue Island police station. Testimony revealed that the police station on 83rd and King Drive does not have a holding facility, and it is therefore customary to transfer suspects to other police stations when a holding facility becomes necessary.

At approximately 11:30 on that Saturday morning, September 10, 1994, Assistant State’s Attorney Pierre Tismo arrived at the Blue Island police station to assist in the investigation. Defendant was advised of his 
Miranda
 rights and agreed to speak to Tismo. During an interview that lasted for about an hour, until 12:30 p.m., defendant stated that he had spoken to Angela on August 27, 1994, at the grocery store parking lot. Defendant said that they met to talk about Angela’s upcoming move to Iowa. Defendant recounted that he, Angela, and Christopher drove in his car to defendant’s apartment, where defendant and Angela argued. Defendant stated that he hit Angela with his open hand, with his fist, and with a baseball bat. When Tismo asked how Angela’s body ended up in the Calumet Sag Channel, defendant responded that he put her there. When asked where Christopher was, defendant put his head down and cried. Defendant stated that authorities could find Christopher where they found Angela.

While Tismo was interviewing defendant, Officer Carolyn Black, who was in charge of the investigation and who had interviewed defendant the previous day, was at home preparing to come to work. Officer Black testified at the suppression hearing that, at approximately 11:30 to 11:40 on that Saturday morning, she received a page. She dialed the phone number, and the person who answered identified himself as an attorney representing “defendant’s father.” Officer Black had apparently spoken to defendant’s father at 83rd and King Drive the previous day when defendant’s father had gone there to inquire about defendant. Defendant’s father had been informed that defendant was being questioned about the disappearance of Angela and Christopher. In response to the caller’s request for information regarding defendant, Officer Black stated that she was at home, that she had no way of verifying the caller’s identity, and that she would not discuss defendant’s case over the telephone. According to Officer Black, when the caller began to shout at her, she terminated the call.

Shortly after this telephone conversation, Officer Black left for work. During her 70-minute drive to the Blue Island police station, Officer Black received another page with a phone number she did not recognize. She was not able to return this page because she did not have a cellular phone. Officer Black arrived at the Blue Island police station at around 1:30 p.m.

Nathan Diamond-Falk also testified at the suppression hearing. On Saturday, September 10, 1994, at about 10 a.m., defendant’s father retained him to represent defendant. Diamond-Falk testified that at some time he made several telephone calls to obtain information about defendant, and was eventually given the name and pager number of Officer Black. He paged Officer Black, who returned the call at about 11 a.m. but refused to give him information without first verifying his identity. According to Diamond-Falk, he gave Officer Black the phone number and address of his home and office so that she could confirm his identity. Diamond-Falk maintained that Officer Black stated that she would call him back, but that she never did.

Diamond-Falk then drove to the police station at 83rd and King Drive. Diamond-Falk testified that he arrived at the police station at approximately 12:30 or 12:45 p.m. Diamond-Falk, however, testified that he remembered listening to the Michigan versus Notre Dame football game on his way to the station. The parties stipulated that on September 10, 1994, this football game started at 1:45 p.m. Diamond-Falk stated that he arrived at the police station in the afternoon, but did not recall the exact time. Diamond-Falk stated that, when he was at the police station, he informed individuals that he was an attorney and that he represented defendant, but that he was not told defendant’s location. Diamond-Falk did not remember the description of the person to whom he spoke when he arrived at the police station. The officer on duty at the 83rd and King Drive police station from 7 a.m. to 3 p.m. on Saturday, September 10, 1994, testified that he did not recall talking with Diamond-Falk. Diamond-Falk testified that he remained at the police station for two hours, but was never told of defendant’s location. On Sunday, September 11, 1994, defendant gave more detailed statements regarding the murders. Diamond-Falk never met with defendant on Sunday.

The trial court found that “the defendant was advised of his 
Miranda
 warnings numerous times, agreed to waive those warnings and agreed to speak to authorities; that the defendant did not ask to speak [to] or see a lawyer; that the defendant voluntarily consented to the searches; that the police or the state’s attorney did not coerce the defendant into giving any oral or written statements.” The trial court further found that “the move from 83rd and King to the Blue Island police station was not made in order to hold the defendant incommunicado; that the move was made in good faith pursuant to [a] valid investigatory process,” and that the “immediate investigating police and state’s attorney were not aware that Mr. Diamond-Falk arrived at the 83rd Street station.” Nevertheless, the trial court held that, under 
People v. McCauley
, 163 Ill. 2d 414 (1994), any statements made after attorney Diamond-Falk arrived at the police station at 83rd and King Drive, where defendant was last seen, must be suppressed. The trial court found that Diamond-Falk arrived at the police station at 2 p.m. on Saturday, September 10, 1994. Thus, the trial court suppressed all statements given by defendant after that time.

Defendant now contests the admissibility of the statement that he gave to the assistant State’s Attorney on Saturday, September 10, 1994, from approximately 11:30 a.m. to 12:30 p.m. Defendant argues that this statement also should have been suppressed because it was obtained in violation of the constitutional principles expressed in 
McCauley
. We note that a trial court’s ruling on a motion to suppress evidence generally is subject to reversal only if manifestly erroneous. 
People v. Johnson
, 182 Ill. 2d 96, 108 (1998); 
People v. Kidd
, 175 Ill. 2d 1, 27 (1996). The issue in this appeal, however, involves the trial court’s application of the law to uncontested facts, and we therefore conduct 
de novo
 review. See 
People v. Wright
, 183 Ill. 2d 16, 21 (1998).

A defendant’s right against self-incrimination is guaranteed by the fifth and fourteenth amendments of the United States Constitution and by article I, section 10, of the Illinois Constitution of 1970. This right includes the right to an attorney. 
McCauley
, 163 Ill. 2d at 421. A defendant, however, may waive these rights, provided that the waiver is voluntary, knowing, and intelligent. In determining whether this waiver is knowing and intelligent, a court considers the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation. 
McCauley
, 163 Ill. 2d at 421. The State bears the burden of proving, by a preponderance of the evidence, that the defendant made a voluntary, knowing, and intelligent waiver of these rights. 
McCauley
, 163 Ill. 2d at 422. This court in 
McCauley
 addressed these principles.

In 
McCauley
, the defendant was brought to the police station for questioning in connection with a murder. The defendant was advised of his 
Miranda
 rights and did not request an attorney. However, unbeknownst to the defendant, his family had retained an attorney for him. The defendant’s attorney called the police station and ultimately went to the police station and requested to speak with the defendant. When the defendant’s attorney arrived at the police station, the police officers refused the attorney access to the defendant and also failed to inform the defendant that his attorney was present at the station and seeking to consult with him. The defendant subsequently gave a statement to the police in response to their questioning. The trial court granted the defendant’s motion to suppress the statement. 
McCauley
, 163 Ill. 2d at 418-20.

This court affirmed the suppression of the defendant’s statement on the ground that the conduct of the police violated the defendant’s rights under the Illinois Constitution. This court explained that the United States Supreme Court, in 
Moran v. Burbine
, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), rejected the contention that such police conduct violated a defendant’s right to counsel under the fifth amendment to the United States Constitution. Nevertheless, this court in 
McCauley
 proceeded to consider whether such conduct violated the defendant’s right to counsel under article I, section 10, of the Illinois Constitution of 1970. This court concluded that the right to counsel under the Illinois Constitution should be construed more broadly than its federal counterpart. 
McCauley
, 163 Ill. 2d at 423-24.

This court in 
McCauley
 proceeded to hold that the conduct of the police rendered the defendant’s waiver of counsel invalid. The record showed that the police refused the defendant’s attorney access to the defendant during interrogation and did not inform defendant that his attorney “was present at the station, seeking to consult with him.” 
McCauley
, 163 Ill. 2d at 445. Thus, the defendant was denied information necessary to “knowingly and intelligently waive his right to his attorney’s presence as well as the actual and immediately available assistance of his own attorney.” 
McCauley
, 163 Ill. 2d at 446. In light of these circumstances, this court held that the State failed to satisfy its burden of showing that the defendant knowingly waived his right to counsel under the Illinois Constitution (see Ill. Const. 1970, art. I, §10). 
McCauley
, 163 Ill. 2d at 445-46.

This court also concluded that, based upon the record, the defendant’s statement to the police was obtained in violation of the defendant’s due process rights under article I, section 2, of the Illinois Constitution of 1970. The court held that “due process is violated when police interfere with a suspect’s right to his attorney’s assistance and presence by affirmatively preventing the suspect, exposed to interrogation, from receiving the immediately available assistance of an attorney hired or appointed to represent him.” 
McCauley
, 163 Ill. 2d at 444.

Our appellate court has faced the issue of whether the holding in 
McCauley
 applied to factual scenarios where an attorney merely telephoned the police station to contact a client in custody. The appellate court has reached different results in those cases. Compare 
People v. Milestone
, 283 Ill. App. 3d 682, 684-87 (1996) (holding that police officers’ failure to inform the defendant in custody that his attorney was on the telephone seeking to consult with him rendered the defendant’s subsequent statements not admissible), with 
People v. Albrecht
, 271 Ill. App. 3d 629, 630-32, 637, 639 (1995) (holding, in a situation where the police did not inform the defendant in custody that an attorney was seeking to consult with him by telephone and then later in person at the police station, that all statements made after the attorney arrived at the police station were not admissible, but that any statements made before the attorney arrived at the police station were admissible). For the following reasons, we hold that, in this case, the 
McCauley
 rule does not require the suppression of the statement that defendant made after the time that his attorney telephoned the police station, but before the time his attorney was physically present at the police station. To the extent that the appellate court decision in 
People v. Milestone
, 283 Ill. App. 3d 682 (1996), is not consistent with our holding, it is hereby overruled.

This court in 
McCauley
 squarely held that a defendant’s state constitutional rights were violated where the police denied the attorney retained for the defendant 
physical
 access to the defendant during interrogation, and where the police did not inform the defendant that the attorney was seeking to consult with him 
at the police station
. 
McCauley
, 163 Ill. 2d at 444-46. Under those circumstances, the State failed to satisfy its burden of showing that the defendant had knowingly waived his state constitutional rights. 
McCauley
, 163 Ill. 2d at 445.

The circumstances in this case are different from the circumstances in 
McCauley
. On Saturday, September 10, 1994, defendant, after being repeatedly advised of his 
Miranda
 rights, confessed that he hit Angela with his open hand, with his fist, and with a baseball bat, and that he put Angela in the Calumet Sag Channel. Defendant made this statement between 11:30 a.m. and 12:30 p.m. Defendant’s attorney did not arrive at the police station until 2 p.m. and was therefore not “physically present” and “immediately available” to defendant until that time. The trial court suppressed all statements defendant made after 2 p.m. Here, the State satisfied its burden of showing that defendant knowingly waived his state constitutional rights. Indeed, the trial court found that “the defendant was advised of his 
Miranda
 warnings numerous times, agreed to waive those warnings and agreed to speak to authorities; that the defendant did not ask to speak [to] or see a lawyer; *** that the police or the state’s attorney did not coerce the defendant into giving any oral or written statements.”

Defendant nevertheless suggests that the police conduct in this case was deceitful and that this conduct impacted his decision to knowingly waive his rights. He references the fact that authorities moved defendant from the Illinois State Police station on 83rd and King Drive to the Blue Island police station. Contrary to defendant’s contentions, the record in this case does not reveal any deceitful acts by the police. The trial court specifically found that “the move from 83rd and King to the Blue Island police station was not made in order to hold the defendant incommunicado; that the move was made in good faith pursuant to [a] valid investigatory process.” Testimony at the suppression hearing revealed that the police station on 83rd and King Drive does not have a holding facility, and it is therefore customary to transfer suspects to other police stations when a holding facility becomes necessary. Moreover, the trial court held that any statements defendant made after 2 p.m., the time when defendant’s attorney arrived at the 83rd and King Drive police station, were not admissible, as this was the last known location of defendant. The decision in 
McCauley
 focused on the deceitful acts by the police which prevented immediately available counsel from assisting a client during custodial interrogation. See 
Johnson
, 182 Ill. 2d at 106 (discussing the 
McCauley
 holding in rejecting the defendant’s argument that his statement should be suppressed because he gave the statement after the police removed him from a room where he was waiting to appear for a preliminary hearing on an unrelated charge). There was no such deceitful conduct in this case.

Defendant, however, also references Officer Black’s refusal to give attorney Diamond-Falk information when Diamond-Falk telephoned Officer Black. We do not view Officer Black’s prudent refusal to discuss the details of defendant’s case over the telephone with a stranger to constitute deceitful conduct. This situation exemplifies the problems inherent in expanding the holding in 
McCauley
 to situations where an attorney who is seeking contact with a client in custody is not physically present at the police station. The police have no way of verifying that the voice on the telephone is actually the suspect’s attorney. Defendant suggests that this problem could be rectified by requiring the attorney to provide the police his or her Attorney Registration and Disciplinary Commission number. There is still no way to verify that this number belongs to the voice on the telephone. Only through physical presence may the police verify, through proper identification, that the person in front of them is the person he or she is claiming to be.

We hold that, under 
McCauley
, the statements that defendant made after his attorney arrived at the police station were properly suppressed. The statement that defendant made before his attorney arrived at the police station was properly admitted at defendant’s trial. This holding strikes the appropriate balance between the state’s interest in effective crime investigation and a suspect’s state constitutional rights to due process and against self-incrimination (see Ill. Const. 1970, art. I, §§2, 10).

Because of our resolution of this issue, we need not address the State’s alternative argument that, in light of all of the other evidence of defendant’s guilt, the admission of defendant’s statement was harmless error and does not require a new trial.

B. 
Delay Between Arrest and Preliminary Hearing

Defendant next argues that his statement should be suppressed because of the three-day delay between his arrest and his preliminary hearing. Defendant was arrested at approximately 7 a.m. on Friday, September 9, 1994. According to the testimony at the suppression hearing, defendant was brought to the Markham courthouse for a preliminary hearing late in the evening on Sunday, September 11, 1994, or early in the morning on Monday, September 12, 1994. Defendant argues that this three-day delay entitles him to a new trial at which his statement from Saturday, September 10, 1994, must be suppressed. We reject defendant’s argument.

Illinois law provides that a person arrested with or without a warrant shall be brought before a judge for a preliminary hearing “without unnecessary delay.” 725 ILCS 5/109–1(a) (West 1998). This court has held that a delay between an arrest and a preliminary hearing is merely a factor to be considered in determining whether a confession was voluntary and, therefore, does not invalidate a confession 
per se
. See 
People v. House
, 141 Ill. 2d 323, 380 (1990). Whether a confession is voluntary is judged by the totality of the circumstances, which include: the age, education, and intelligence of the accused; the duration of both the detention and the questioning; whether the accused was advised of his or her constitutional rights; and whether the accused was subjected to physical mistreatment. See 
House
, 141 Ill. 2d at 376. Where, as here, a trial court’s ruling on a motion to suppress a confession involves factual determinations and credibility assessments, a reviewing court will not disturb the ruling unless it is manifestly erroneous. See 
Johnson
, 182 Ill. 2d at 108.

The trial court in this case found that “the defendant was advised of his 
Miranda
 warnings numerous times, agreed to waive those warnings and agreed to speak to authorities; that the defendant did not ask to speak [to] or see a lawyer; that the defendant voluntarily consented to the searches; that the police or the state’s attorney did not coerce the defendant into giving any oral or written statements.” The record shows that defendant was an educated adult. Defendant was fully advised of his constitutional rights. Defendant was given opportunities to eat, sleep, and use the restroom, and the questioning was intermittent. There was no physical mistreatment. The trial court also found that the time between defendant’s arrest and defendant’s first court appearance was not unreasonable, as the delay was attributable to the search for the missing five-month-old Christopher. The trial court’s holding that defendant’s confession was voluntary is not manifestly erroneous.

Defendant nevertheless argues that the delay between his warrantless arrest and preliminary hearing violated his fourth amendment right to a prompt determination of probable cause. See U.S. Const., amend. IV; 
Gerstein v. Pugh
, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). In 
County of Riverside v. McLaughlin
, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991), the United States Supreme Court held that a judicial determination of probable cause within 48 hours of arrest generally passes constitutional muster. When a probable cause determination is not made within 48 hours of arrest, the burden shifts to the government to show the existence of a 
bona fide
 emergency or other extraordinary circumstances to justify the delay. 
McLaughlin
, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

Here, as the trial court found, the delay was attributable to the existence of the emergency of finding the missing five-month-old Christopher. The police knew that Christopher was last seen with defendant. Divers had been unsuccessful in their efforts to find Christopher in the Calumet Sag Channel. Much of the questioning of defendant that occurred during the three-day period focused on seeking information regarding Christopher’s location. We therefore reject defendant’s argument that he is entitled to a new trial at which his statement must be suppressed.

C. 
Motion to Quash Arrest and Suppress Evidence

Prior to trial, defendant filed a motion to quash his arrest and suppress evidence resulting from the arrest. After a hearing, the trial court denied defendant’s motion. The trial court found that the police had probable cause to arrest defendant on the morning of Friday, September 9, 1994, when police officers arrived at his apartment. The trial court also found that defendant allowed the police officers into his apartment and then voluntarily signed a form consenting to a search of his apartment and his car. Defendant now argues that the trial court erred in denying his motion to quash his arrest and suppress evidence. Defendant contends that he was arrested without probable cause and that he is therefore entitled to a new trial at which all evidence resulting from his arrest must be suppressed. Defendant argues that the consent-to-search form was also a product of his unlawful arrest and that all evidence resulting from this consent therefore must be suppressed. We reject defendant’s argument and hold that the police had probable cause to arrest defendant at his apartment on the morning of Friday, September 9, 1994.

Both the United States Constitution and the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §6. A warrantless arrest is lawful where police have knowledge of facts which would lead a reasonable person to believe that a crime has occurred and that the person to be arrested committed the crime. 
People v. Buss
, 187 Ill. 2d 144, 204 (1999); 
People v. Kidd
, 175 Ill. 2d 1, 22 (1996). The determination of whether police had probable cause to arrest focuses on the factual considerations upon which reasonable, prudent people, not legal technicians, act. 
Buss
, 187 Ill. 2d at 204; 
Kidd
, 175 Ill. 2d at 24. This determination considers facts known to the police at the time the arrest was made. 
Buss
, 187 Ill. 2d at 204. A defendant has the burden of demonstrating an illegal search or seizure. 
Buss
, 187 Ill. 2d at 204; 
Kidd
, 175 Ill. 2d at 22. When a trial court’s ruling on a motion to quash arrest and suppress evidence involves factual determinations and credibility assessments, a reviewing court will not reverse the ruling unless it is manifestly erroneous. See 
Buss
, 187 Ill. 2d at 204; 
People v. Wright
, 183 Ill. 2d 16, 21 (1998). 
De novo
 review is appropriate, however, when there are no factual or credibility disputes, and the appeal therefore involves a pure question of law. 
Buss
, 187 Ill. 2d at 204-05; 
Wright
, 183 Ill. 2d at 21. The resolution of defendant’s argument in this appeal does not turn on such disputes; thus, our review is 
de novo
.

Here, the police had probable cause to arrest defendant based upon the following information which was known to the police at the time of the arrest. Angela’s body, bound with weights, had been retrieved from the Calumet Sag Channel on September 4, 1994. The police interviewed Curtis Taylor, the brother of Louis Murillo, Angela’s fiancé. Taylor was with Angela in a grocery store parking lot on August 27, 1994. As they were sitting in their car waiting for other family members in the store, defendant approached the car and had a discussion with Angela. Defendant shoved Angela into his car and drove away with Angela and Christopher. This was the last time Angela and Christopher were seen alive. Taylor described Angela as “frightened” and defendant as “hostile.” Records showed that the car defendant owned matched Taylor’s description of defendant’s car. The fact that Angela was last seen alive when she drove away with defendant supports the probable cause finding. See 
Buss
, 187 Ill. 2d at 206-08.

Additionally, the clothing found on Angela’s body was identified as the clothing Angela was wearing on the day she disappeared. The September 5, 1994, autopsy revealed that Angela’s body had been in the water for several days. This was consistent with the time between when Angela disappeared and when her body was retrieved from the channel.

Further, a police report and interviews with Angela’s grandmother and Elaina Murillo, the sister of Angela’s fiancé, revealed some of the abuse that Angela suffered at the hands of defendant during their relationship. Finally, Elaina Murillo also revealed that Angela was engaged to Louis Murillo and was planning to move to Iowa to live with him.

These circumstances would lead a reasonable person to conclude that a crime had been committed and that defendant committed the crime. “ ‘[P]robability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause is present.’ ” 
Buss
, 187 Ill. 2d at 205-06, quoting 
People v. House
, 141 Ill. 2d 323, 370 (1990). Here, the totality of the circumstances reveals that the police had probable cause to arrest defendant at his apartment on the morning of Friday, September 9, 1994.

As a final matter, we reject defendant’s suggestion that the State did not establish probable cause to arrest him because a police officer testified at the hearing that the police would not have been able to obtain an arrest warrant before going to defendant’s apartment. “Probable cause is an objective standard, and an officer’s subjective belief as to the existence of probable cause is not determinative.” 
Buss
, 187 Ill. 2d at 209 (rejecting the defendant’s argument that the determination of probable cause was affected by police officers’ testimony that they did not believe that they had probable cause to arrest the defendant). As we have discussed, the facts demonstrate that the police had probable cause to arrest defendant, and a subjective belief to the contrary does not change that conclusion.

We hold that the police had probable cause to arrest defendant at his apartment on the morning of Friday, September 9, 1994. We therefore reject defendant’s argument that he is entitled to a new trial at which all evidence resulting from that arrest must be suppressed.

D. 
Admissibility of Autopsy and Crime Scene Photographs

Defendant next argues that he was denied his due process right to a fair trial when the trial court admitted into evidence certain photographs from the autopsy and the crime scene, and allowed six of these photographs to be sent to the jury during deliberations. According to defendant, “[w]here the cause of death was stated to be consistent with strangulation and suffocation, and the State 
nolle prossed
 the concealment of homicide counts, there was no purpose served by the admission of gory photographs from the scene and the autopsy.”

The decision of whether a jury should be allowed to see photographs of a decedent is a decision that rests within the sound discretion of the trial judge. 
People v. Heard
, 187 Ill. 2d 36, 76-77 (1999); 
People v. Henderson
, 142 Ill. 2d 258, 319 (1990). If photographs are relevant to prove facts at issue, they are admissible and may be shown to the jury unless the prejudicial nature of the photographs outweighs their probative value. 
Heard
, 187 Ill. 2d at 77; 
Henderson
, 142 Ill. 2d at 319. When a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact. 
Henderson
, 142 Ill. 2d at 319. Among the valid reasons for admitting photographs of a decedent are to prove the nature and extent of the injuries, the position, condition, and location of the body, and the manner and cause of death; to corroborate a defendant’s confession; and to aid in understanding the testimony of a pathologist or other witness. See 
Heard
, 187 Ill. 2d at 77; 
Henderson
, 142 Ill. 2d at 319-20. If photographs could aid the jury in understanding testimony, they may be admitted even if cumulative of that testimony. 
Heard
, 187 Ill. 2d at 77; 
Henderson
, 142 Ill. 2d at 320.

Here, the photographs about which defendant complains include depictions of Angela’s body in the Calumet Sag Channel; Angela’s decomposed face and body after being recovered from the channel; Angela’s back, showing the cords used to tie the weights to her body; and Christopher’s decomposed body after being recovered from the channel. Parenthetically, we note that the record does not include all of the actual photographs to which defendant refers.

The trial court did not abuse its discretion in admitting these photographs. The State presented these photographs to certain witnesses during their testimony. An investigating police officer used a photograph of Angela’s body in the channel to explain his testimony regarding the recovery of Angela’s body by the dive team. A crime scene investigator used photographs of Angela’s body in and out of the channel to explain his testimony about the location and condition of her body and about the collection of evidence at the scene. The pathologist used photographs of Angela’s face and back after recovery from the channel in discussing the effects of decomposition in the water, including skin slippage and distortion of facial features. A crime scene investigator used a photograph of Christopher’s body after recovery to explain the extensive decomposition that occurred and the position of the electrical cords and weights on his body. These are all valid reasons for admitting photographs of a decedent. See 
Heard
, 187 Ill. 2d at 77; 
Henderson
, 142 Ill. 2d at 319-20. As we have discussed, the prosecution is allowed to prove every element of the crime charged and every relevant fact.

The trial court likewise did not abuse its discretion in allowing six of these photographs to be sent to the jury during deliberations. The record reveals that the trial court carefully examined these photographs and determined that they were relevant to the issues involved in the case. The trial court then determined that the probative value of these six photographs was not outweighed by any prejudice. The record reflects that the trial court chose to send to the jury what the court termed to be the least “graphic” photographs. In doing so, the trial court allowed only six of the photographs to be sent to the jury for deliberations. These photographs served to assist the State in proving the position, condition, and location of the victims’ bodies. The photographs also served to aid the jury’s understanding of the testimony of the pathologist and the crime scene investigators. We note that the trial court also instructed the jury, prior to deliberations, that, “[p]hotographs of the deceased have been admitted into evidence and will be received by you. These photographs are admitted to better help you understand the evidence in this case. The photographs should not be allowed to influence your passions. Neither sympathy or prejudice should influence your decision.” We therefore reject defendant’s argument that he is entitled to a new trial based on the admission of these photographs.

E. 
Prim Instruction

Defendant argues that he is entitled to a new trial because the trial court erred when it denied defendant’s request, made before the jury began deliberations, to give the jury a 
Prim
 instruction. See 
People v. Prim
, 53 Ill. 2d 62 (1972). The 
Prim
 instruction informs the jury of the requirement that the verdict be unanimous; that the jury has a duty to deliberate; that jurors must impartially consider the evidence; and that jurors should not hesitate to reexamine their views and change their opinions if they believe them to be erroneous, provided the change is not solely because of the opinion of fellow jurors or for the mere purpose of returning a verdict. 
Prim
, 53 Ill. 2d at 75-76. It is up to the trial court’s discretion whether to give such an instruction and, if so, when to give the instruction. 
People v. Cowan
, 105 Ill. 2d 324, 328 (1985). The trial court should make these determinations based upon such factors as the length of time already spent in deliberation and the complexity of the issues before the jury. 
Cowan
, 105 Ill. 2d at 328.

In this case, before the jury began its deliberations, defendant requested that the jury receive the 
Prim
 instruction. The State objected to this instruction on the basis that it was premature. The trial court agreed and denied defendant’s request, stating that this instruction “is only given when the jury is having a problem with their coming to a verdict.” We hold that the trial court did not abuse its discretion in denying the 
Prim
 instruction. The purpose of the 
Prim
 instruction is to guide a jury that is unable to reach a unanimous verdict. 
Cowan
, 105 Ill. 2d at 328. Here, defendant requested the 
Prim
 instruction before the jury even began to deliberate. Defendant does not argue that the jury in this case had any difficulty reaching a unanimous verdict, and the record reflects no such difficulty.

Defendant cites 
People v. McNeal
, 94 Ill. App. 3d 1000 (1981), in which the defendant argued that the trial court erred in giving a 
Prim
 instruction to the jury prior to deliberations. The court in 
McNeal
 rejected this argument, holding that the defendant failed to show how he was prejudiced by the instruction. 
McNeal
, 94 Ill. App. 3d at 1004-05. Defendant’s reliance on cases such as 
McNeal
 is misplaced. Even if the 
Prim
 instruction may be given prior to jury deliberations, the trial court’s failure to do so is not error. As discussed, it is within the trial court’s discretion whether to give such an instruction and, if so, when to give the instruction. See 
Cowan
, 105 Ill. 2d at 328.

Defendant nevertheless argues that the trial court erred in failing to recognize that it had the discretion to give the 
Prim
 instruction before the jury began to deliberate. Defendant contends that the “failure to recognize the existence of judicial discretion is itself an abuse of discretion and requires reversal of the convictions in this case.” In support of this contention, defendant cites 
People v. Gibson
, 136 Ill. 2d 362 (1990), and 
People v. Queen
, 56 Ill. 2d 560 (1974).

In 
Queen
, the trial court refused a jury’s request during deliberations for a review of the defendant’s testimony. The trial court erroneously responded that it did not have discretion to allow the request. 
Queen
, 56 Ill. 2d at 565. This court reversed and remanded for a new trial. We noted that error occurs “when a trial court refuses to exercise discretion in the erroneous belief that it has no discretion as to the question presented.” 
Queen
, 56 Ill. 2d at 565. This court held that, under the circumstances of the case, where the jury’s determination of the defendant’s credibility was a critical factor, the trial court’s error was of such substance as to require a new trial. 
Queen
, 56 Ill. 2d at 565-66.

In 
Gibson
, the trial court granted the public defender’s motion for leave to withdraw as standby counsel for a 
pro se
 defendant based upon the mistaken belief that the court did not have statutory authority to make such an appointment. Consequently, the defendant represented himself 
pro se
 in a capital murder case. 
Gibson
, 136 Ill. 2d at 372-74. This court, however, determined that the trial court possessed the discretion to appoint standby counsel and was authorized by statute to appoint the public defender’s office as standby counsel. We held that, under the circumstances of the case, the failure to appoint standby counsel would have been an abuse of discretion, and the trial court’s refusal to continue the public defender’s appointment as standby counsel prejudiced the defendant such that a new trial was required. 
Gibson
, 136 Ill. 2d at 380-83. Significantly, this court held that, in light of this holding, it need not consider the defendant’s argument, based on 
Queen
, that the trial court’s failure to exercise its discretion, without more, requires reversal. Nevertheless, we noted that the defendant’s reliance on 
Queen
 for this proposition was questionable and that “the utility of the defendant’s suggested rule of automatic reversal is doubtful.” 
Gibson
, 136 Ill. 2d at 380. “For example, if it could be determined that the refusal to appoint standby counsel would not have been an abuse of discretion, there would be no purpose now in remanding the cause for further proceedings solely on the ground that the trial judge failed to exercise his discretion.” 
Gibson
, 136 Ill. 2d at 380.

A review of 
Queen
 and 
Gibson
 demonstrates that “the effect of such a failure to exercise discretion must be assessed in the context of the entire proceeding [citation].” 
Gibson
, 136 Ill. 2d at 379. Here, even if the trial court may give the 
Prim
 instruction prior to deliberations, and assuming that the trial court failed to recognize that it had the discretion to give the jury the 
Prim
 instruction prior to deliberations, and that this was error, this is not an error of such magnitude that a new trial is warranted. Defendant has offered no argument to suggest any prejudice resulting from the trial court’s purported failure to recognize that it had the discretion to give the jury the 
Prim
 instruction prior to deliberations. The record does not reflect that the jury had any difficulty in reaching a unanimous verdict. We therefore reject defendant’s argument that he is entitled to a new trial on the basis of the trial court’s failure to give the jury the 
Prim
 instruction.

F. 
Appointment of Additional Counsel

Defendant argues that he is entitled to a new trial because the trial court erred in failing to appoint two attorneys to represent him at trial. Defendant essentially contends that this court should interpret Illinois law to require that all capital defendants be represented at trial by two attorneys.

The State argues that this issue is waived because defendant failed to raise it in his post-trial motion. See 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). We note also that defendant never raised this argument at trial. Defendant argues in his brief in this court that “[o]n November 14, 1997, Mr. Chapman [defendant] requested the circuit court to review his situation wherein he was represented by a single defense counsel.” The record does not support this argument. Defendant cites a colloquy that occurred between defendant and the trial court at a hearing preceding the trial court’s ruling on defendant’s motion to suppress his statements. Defendant complained of counsel’s failure to use certain alleged impeachment evidence.

Defendant nevertheless argues that, even if he waived this contention, we should address it under the plain error doctrine. To preserve an alleged error for review, a defendant must raise a timely objection at trial and identify the alleged error in a written post-trial motion. 
People v. Miller
, 173 Ill. 2d 167, 191 (1996). Failure to preserve an alleged error in such a manner constitutes a procedural default of that error on appeal. 
People v. Simms
, 143 Ill. 2d 154, 170 (1991). Nevertheless, pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), this court may review an argument not properly preserved if we determine that plain error affecting a substantial right has occurred. 
People v. Shaw
, 186 Ill. 2d 301, 326 (1998). Before invoking the plain error exception, however, we determine whether any error occurred. 
People v. Wade
, 131 Ill. 2d 370, 376 (1989).

Defendant contends that he is entitled to a new trial because the trial court erred in failing to appoint two attorneys to represent him at trial. In support of this argument, defendant cites Supreme Court Rule 607(a) (177 Ill. 2d R. 607(a)), which provides in relevant part: “When a death sentence has been imposed, the court may appoint two attorneys, one of whom it shall designate as the responsible attorney and the other as assistant attorney for the appeal.” Defendant argues that Supreme Court Rule 607(a) must be read 
in pari materia
 with the statutes governing the appointment of counsel in capital cases. See, 
e.g.
, 725 ILCS 5/113–3(b) (West 1998) (governing the appointment of counsel in cases where a defendant is indigent); 725 ILCS 5/113–3(d) (West 1998) (governing the payment of expert witnesses in capital cases where the defendant is indigent); 725 ILCS 5/113–3.1 (West 1998) (governing payment for court-appointed counsel). According to defendant, if the statutes are read together with Supreme Court Rule 607(a), they show that two attorneys should be appointed for the trial phase in a capital case.

In 
People v. Howery
, 178 Ill. 2d 1, 52-53 (1997), this court rejected the same argument. We noted that the record showed that the defendant was in fact represented by two attorneys during trial. 
Howery
, 178 Ill. 2d at 53. We then stated: “[S]ection 113–3 does not require the appointment of more than one attorney for a defendant at the trial stage. We reject the defendant’s contention that Supreme Court Rule 607(a) dictates otherwise in a trial context. Rule 607(a) governs the appellate process and permits the appointment of two attorneys on appeal.” 
Howery
, 178 Ill. 2d at 53. In conclusion, Illinois law does not mandate that all capital defendants be represented by two attorneys at trial, and the trial court here did not err in failing to appoint two attorneys to represent defendant at trial. Consequently, we find no plain error and no basis to excuse defendant’s procedural default of this argument.

G. 
Pro Se Post-Trial Motion

Defendant argues that the trial court erred by not appointing a new attorney to argue his 
pro se
 post-trial motion which alleged that his trial counsel was ineffective. Defense counsel filed a motion for a judgment notwithstanding the verdict or, alternatively, a new trial. Defense counsel also filed a motion to vacate defendant’s death sentence. In addition to these post-trial motions, defendant filed a 
pro se
 “motion to set aside jury verdict and motion for new trial.” Defendant alleged that his trial attorneys, Antonio DeCristifaro and Neil Kauffman, provided ineffective assistance of counsel. We note that DeCristifaro represented defendant on some of the pretrial matters. While the hearing on the motion to suppress defendant’s statements was pending, the trial court granted DeCristifaro leave to withdraw from the case because he was the subject of an Attorney Registration and Disciplinary Commission (ARDC) proceeding involving unrelated matters. The trial court appointed the office of the public defender to represent defendant. However, before the hearing on the motion to suppress resumed, the trial court granted the office of the public defender leave to withdraw when Kauffman entered an appearance on defendant’s behalf, and Kauffman remained defendant’s trial attorney. Previously, Kauffman had been the subject of an ARDC proceeding involving unrelated matters, and had been suspended from the practice of law for 18 months, but was reinstated to practice law at the time he entered his appearance in defendant’s case. The record reflects that Kauffman had represented defendant at some earlier point in this case.

Defendant argued in his 
pro se
 post-trial motion that DeCristifaro and Kauffman were ineffective in “failing to provide competent representation, failing to act with reasonable diligence, and [for engaging in] conduct involving dishonesty, fraud, deceit, and misrepresentation.” Defendant referenced documents filed in the underlying ARDC proceedings. Defendant also argued that “at all times from June 1997 [when Kauffman began to represent defendant] until start of the trial in March 1998, defendant had one contact with Kauffman,” and that Kauffman was not adequately prepared to represent defendant.

Following a hearing on the motion to vacate defendant’s death sentence, defendant presented the trial court with this 
pro se
 motion. The trial court repeatedly inquired as to precise allegations of ineffectiveness. In response, defendant stated that trial counsel failed to call two witnesses despite defendant’s request to do so. The first person was Angela’s “best friend she grew up with in Israel, who lives in Indiana.” Defendant did not provide the trial court with her name. In response to the trial court’s inquiry about the proposed purpose of this individual’s testimony, defendant maintained that this individual had lived with him and Angela and could have testified about the relationship between defendant and Angela. The second person was Denise Thigpen, Angela’s former supervisor at work. Thigpen testified at defendant’s sentencing hearing regarding instances when Angela told Thigpen that defendant had abused Angela. Defendant told the trial court that Thigpen’s testimony was not credible.

In response to the trial court’s continued inquiry into precise allegations of ineffectiveness, defendant stated that trial counsel should have checked defendant’s phone records and bank records for the day that Angela and Christopher disappeared. According to defendant, he told trial counsel that on the day of the victims’ disappearance, he was “at a cash station at 63rd and Drexel. I think I was withdrawing money, twenty dollars or whatever.” When the trial court asked what that would prove, defendant replied that it would show that “if I was at a cash station or the house instead of traveling throughout the whole state searching for someone and preconceiving a crime to the victim that I don’t even know where they’re at in the first place.”

After considering the evidence presented by defendant, the trial court denied defendant’s 
pro se
 post-trial motion. The trial court extensively reviewed trial counsel’s performance and found that defendant received the effective assistance of counsel. The trial court concluded, therefore, that it did not have a duty to inquire further regarding defendant’s allegations of ineffective assistance of counsel. During the course of its ruling, the trial court also stated that the evidence to which defendant cites “would not alter the *** verdict of guilty in this particular case, because the evidence was overwhelming in this particular case. And as far as the mitigation and aggravation, it would not alter my opinion, based on the facts and circumstances of the case, considering both the aggravation and mitigation, that the death sentence is the appropriate sentence in this particular case.”

Defendant now argues that the trial court erroneously evaluated defendant’s claim under the prejudice prong of 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), rather than first determining whether new counsel should be appointed to argue defendant’s assertions regarding the ineffectiveness of trial counsel. Defendant argues that we should remand the matter to the trial court with directions to appoint new counsel and to hold a hearing on defendant’s claims of ineffective assistance of trial counsel. We reject defendant’s argument.

This court has never held that new counsel must be appointed when a defendant presents a 
pro se
 post-trial motion alleging ineffective assistance of counsel. 
People v. Towns
, 174 Ill. 2d 453, 466 (1996). Rather, when a defendant presents a 
pro se
 post-trial claim of ineffective assistance of counsel, the trial court should first examine the factual basis for the defendant’s claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then new counsel need not be appointed, and the trial court may deny the 
pro se
 motion. See 
People v. Bull
, 185 Ill. 2d 179, 210-11 (1998); 
People v. Kidd
, 175 Ill. 2d 1, 44-45 (1996). If the allegations show possible neglect of the case, then new counsel should be appointed. 
Bull
, 185 Ill. 2d at 210; 
Kidd
, 175 Ill. 2d at 45. The appointed counsel may then independently evaluate the defendant’s claim and avoid the conflict of interest that trial counsel would experience if counsel had to justify his or her actions contrary to the client’s position. 
Bull
, 185 Ill. 2d at 210. “ ‘[T]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the 
pro se
 defendant’s allegations of ineffective assistance of counsel.’ ” 
Bull
, 185 Ill. 2d at 210, quoting 
People v. Johnson
, 159 Ill. 2d 97, 125 (1994).

Here, defendant presented the trial court with a motion containing conclusory allegations of ineffective assistance of counsel. The record reveals that the trial court made a significant effort to explore the matters that defendant raised in the motion. The trial court elicited defendant’s allegation that trial counsel failed to call two witnesses: Angela’s best friend, whose name defendant did not supply, and Denise Thigpen, whom the State called as a witness during defendant’s sentencing hearing. This allegation did not require the trial court to appoint new counsel. Whether to call certain witnesses is a matter of trial strategy, generally reserved to the discretion of trial counsel. See 
Kidd
, 175 Ill. 2d at 44-45 (holding that the trial court did not err in failing to appoint new counsel to represent the defendant on his 
pro se
 post-trial motion, which alleged that trial counsel was ineffective for failing to call certain alibi witnesses). The trial court also elicited defendant’s allegation that trial counsel failed to present evidence of defendant’s bank records. Defendant argued that his bank records would have shown that he withdrew money on the day that the victims disappeared, and that this would show that he was not preparing to murder Angela. A review of the record shows that the fact that defendant withdrew money on the day that the victims disappeared would not have had any bearing on the case. This claim simply has no merit.

We hold that the trial court adequately inquired into defendant’s allegations of ineffective assistance of trial counsel. The fact that during this inquiry the trial court also referenced the 
Strickland
 prejudice prong does not affect the fact that the matters about which defendant complains lack merit and involve a question of trial strategy. The trial court reviewed counsel’s performance and concluded that counsel provided effective representation. Defendant’s allegations did not show possible neglect of the case. Therefore, the trial court did not err in failing to appoint counsel to assist defendant in presenting the 
pro se
 post-trial motion.

II. Sentencing Issues

A. 
Eligibility

As set forth above, the eligibility phase of defendant’s capital sentencing hearing was conducted before the same jury as at trial. Consequently, defendant could be found eligible for the death penalty only if the jury unanimously found that the State had proven beyond a reasonable doubt that defendant was at least 18 years of age at the time of the commission of the offense and that at least one statutory aggravating factor existed. See 720 ILCS 5/9–1(f), (g) (West 1998); 
People v. West
, 187 Ill. 2d 418, 435 (1999). In this case, defendant’s eligibility for the death penalty was predicated upon the “multiple-murder” statutory aggravating factor set forth in section 9–1(b)(3) and upon the “exceptionally brutal or heinous” statutory aggravating factor set forth in section 9–1(b)(7) of the Criminal Code of 1961. See 720 ILCS 5/9–1(b)(3), (b)(7) (West 1998). The jury returned separate eligibility verdicts finding defendant eligible for the death penalty on both statutory aggravating factors. Defendant challenges both of the jury’s death penalty eligibility verdicts. We address defendant’s arguments relating to each eligibility factor separately.

Defendant first challenges the jury’s finding of eligibility based on the multiple-murder statutory aggravating factor, which authorizes the imposition of the death penalty where the defendant has been convicted of murdering two or more individuals “regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another.” 720 ILCS 5/9–1(b)(3) (West 1998). In conjunction with instructing the jury on the multiple-murder eligibility factor, which here was based solely on the mental state of intent, defendant asserts that the trial court erred when it declined to instruct the jury on the definition of intent. We disagree.

Prior to the eligibility phase of the capital sentencing hearing, defendant requested that the sentencing jury receive the following instruction on the definition of intent: “A person acts with intent to accomplish a result or engage in conduct when his conscious objective or purpose is to accomplish that result or engage in that conduct.” See Illinois Pattern Jury Instructions, Criminal, No. 5.01A (4th ed. 2000) (hereinafter IPI Criminal 4th). The State objected and the trial court ruled that it would give the instruction if the jury requested assistance on the concept of intent after it retired for deliberations. The jury did not make such a request. Nevertheless, the jury did receive the following instruction on the multiple-murder eligibility factor: “The defendant has been convicted of murdering two or more persons so long as the deaths were the result of an intent to kill more than one person, regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts.” See IPI Criminal 4th No. 7B.07(3) and Committee Note.

We find that the sentencing jury was instructed sufficiently on the mental state necessary for finding defendant eligible for the death penalty based on the murders of Angela and Christopher. The element of intent was included in the eligibility instruction given to the jury. Moreover, the word “intent” has a plain meaning within a jury’s common understanding. See 
People v. Hope
, 137 Ill. 2d 430, 493 (1990), 
judgment vacated on other grounds & rem’d
, 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792 (1991). Any additional instruction on the meaning of intent therefore was not necessary in this case.

We also reject defendant’s reliance on Supreme Court Rule 451 as requiring the trial court to instruct the jury on the definition of intent because it was a pattern jury instruction. Our Rule 451(a) provides that whenever the Illinois Pattern Jury Instructions contain an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the pattern instruction shall be used. 177 Ill. 2d R. 451(a). This rule does not mandate the giving of any instruction merely because one exists on defendant’s theory of the case. 
People v. Lewis
, 165 Ill. 2d 305, 355 (1995). Instead, whether to give an instruction remains a matter for the court’s determination. 
Lewis
, 165 Ill. 2d at 355. Where the court determines that the jury should be instructed on a particular subject and an appropriate IPI instruction exists, it will be used. 
People v. Gilliam
, 172 Ill. 2d 484, 519 (1996); 
Lewis
, 165 Ill. 2d at 355. In the case at bar, the trial court determined that the jury should be instructed on the multiple-murder aggravating factor. Consequently, the jury was properly given the IPI instruction for multiple murder. The trial court also found that there was no necessity for the additional instruction regarding the definition of intent. In light of the multiple-murder instruction given to the jury and the failure to show any confusion on the jury’s part regarding the term “intent,” the trial court did not err in denying defendant’s request for a jury instruction defining intent.

In a related argument, defendant contends that he was not properly found eligible for the death penalty based on the multiple-murder eligibility factor where the eligibility verdict was legally insufficient because the verdict form omitted the culpable mental state necessary to support a finding of death eligibility. Defendant argues that he is entitled to a new sentencing hearing pursuant to this court’s decision in 
People v. Mack
, 167 Ill. 2d 525 (1995).

The State responds that defendant cannot raise this issue on appeal because he failed to object to the eligibility verdict form at sentencing and failed to raise the sufficiency of the form in his post-sentencing motion. Alternatively, the State argues that a new sentencing hearing is not necessary. The State does not dispute that the eligibility verdict form was deficient under this court’s decision in 
Mack
. Nevertheless, the State argues that 
Mack
 does not require vacating defendant’s death sentence.

We find that defendant has waived this issue for review because he failed to object at sentencing and in his post-sentencing motion. See 
Simms
, 143 Ill. 2d at 170. Defendant asserts, however, that the defective verdict form constituted plain error. We hold that, under the facts of this case, the omission of the mental state from the eligibility verdict is not so fundamental a defect that it amounted to plain error.

In 
Mack
, the defendant was found guilty of murder and armed robbery at a bench trial. The sentencing hearing was conducted before a jury, which was instructed to determine whether the defendant was eligible for the death penalty solely on the basis of the statutory aggravating factor of murder in the course of another felony (see Ill. Rev. Stat. 1979, ch. 38, par. 9–1(b)(6)). The jury then returned a verdict finding the defendant eligible for the death penalty. The eligibility verdict form read: “ ‘We the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery.’ ” 
Mack
, 167 Ill. 2d at 529-30. The defendant alleged in his post-conviction petition that appellate counsel was ineffective for not raising on direct appeal that the death-eligibility verdict was legally insufficient. The defendant argued that the jury failed to find that the statutory aggravating factor was proven given that the eligibility verdict form omitted the culpable mental state required to establish murder in the course of a felony. The trial court found appellate counsel ineffective, vacated the defendant’s death sentence, and ordered a new sentencing hearing.

A majority of this court affirmed and held that appellate counsel was ineffective for failure to seek reversal of the defendant’s death sentence on the basis of the defective eligibility verdict. 
Mack
, 167 Ill. 2d at 533-38. In so holding, we found appellate counsel’s performance to be deficient for failing to recognize the fundamental importance of a legally sufficient eligibility verdict, which must include a finding on all essential elements of the statutory aggravating factor at issue where the verdict attempts to set forth the elements of that factor. 
Mack
, 167 Ill. 2d at 533, 538. In support of our holding, we pointed out that a culpable mental state of intent to kill or knowledge of a strong probability of death or great bodily harm is an essential element of the particular statutory aggravating factor upon which the defendant’s eligibility for the death penalty was based, namely, murder in the course of a felony. 
Mack
, 167 Ill. 2d at 533. Next, we found that, had appellate counsel raised the issue of the defective eligibility verdict, there is a reasonable probability that the defendant’s death sentence would have been reversed. 
Mack
, 167 Ill. 2d at 533-38. We based this finding on a determination that the meaning of the jury’s eligibility verdict could not be determined clearly and without speculation from the record, which included a discrepancy between the jury instructions and the verdict form at the eligibility phase. 
Mack
, 167 Ill. 2d at 535-37. The court therefore concluded that appellate counsel was ineffective for failing to raise on direct appeal the issue that the death eligibility verdict was legally insufficient because the jury had not found the mental state necessary for finding the defendant eligible for the death penalty. 
Mack
, 167 Ill. 2d at 538. Accordingly, the court vacated the defendant’s death sentence and remanded for a new sentencing hearing. 
Mack
, 167 Ill. 2d at 539.

In this case, the State relied on the multiple-murder statutory aggravating factor. See 720 ILCS 5/9–1(b)(3) (West 1998). To be eligible for the death penalty under section 9–1(b)(3), a defendant must have been convicted of murdering two or more individuals “regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another.” 720 ILCS 5/9–1(b)(3) (West 1998). The jury was instructed as to the elements for finding defendant eligible for the death penalty under section 9–1(b)(3), which in this case was limited to the mental state that the “deaths were the result of an intent to kill more than one person.” The eligibility verdict form returned by the jury stated:

“We, the jury, unanimously find beyond a reasonable doubt that the defendant, Reginald Chapman, is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that the defendant was 18 years old or older at the time of the murders for which he was convicted in this case; and the following statutory aggravating factor exists: The defendant has been convicted of murdering two or more persons, regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts.”

The circumstances surrounding the multiple-murder eligibility verdict form in this case contrast sharply with those present in
 Mack
. As noted, in 
Mack
 the defendant was found guilty at a bench trial but was found eligible for the death penalty by a jury. Consequently, the sentencing jury in 
Mack
 had not made a determination at the guilt phase of the trial regarding the defendant’s mental state while committing the murder. Thus, the jury’s decision as to whether the State proved the defendant’s mental state for purposes of finding the defendant eligible for the death penalty under the aggravating factor of murder in the course of a felony aggravating factor could not be ascertained from the record. See 
Mack
, 167 Ill. 2d at 537 (explaining that all parts of the record will be searched and interpreted together in determining the meaning of a verdict).

Unlike in 
Mack
, the record in this case provides assistance in determining the meaning of the jury’s eligibility verdict. Here, the same jury that found defendant eligible for the death penalty had previously found defendant guilty at trial of the first degree murder of Angela Butler and the first degree murder of Christopher Butler. Although the jury returned general guilty verdicts at trial, it had been instructed only on intentional and knowing murders (720 ILCS 5/9–1(a)(1), (a)(2) (West 1998)), which formed the basis of the jury’s general verdicts. See 
People v. Cardona
, 158 Ill. 2d 403, 411 (1994) (noting that where an indictment contains several counts arising out of a single transaction and a general verdict is returned, the effect is that the defendant is guilty as charged in each count to which the proof is applicable). At trial, the jury was instructed for each victim that in order to find defendant guilty of first degree murder it would have to find that 
he intended to kill or do great bodily harm to the victim, or he knew his acts would cause death to the victim, or he knew that his acts created a strong probability of death or great bodily harm to the victim
. The same mental states of intent and knowledge are required for a finding of eligibility on the basis of the multiple-murder aggravating factor. At eligibility, the jury was instructed that it must find intent to kill more than one person on the part of defendant. The jury also was instructed to consider evidence from the guilt phase of the trial. The record at the guilt phase of defendant’s trial reveals that the jury heard evidence of intentional murder on the part of defendant. More specifically, the jury was presented with evidence that defendant struck Angela with an open hand, his fist and a baseball bat, causing a laceration on the back of her head; that defendant bound both victims with electrical cords, strapped heavy weights to their bodies, and dumped them into the Calumet Sag Channel. The jury’s eligibility verdict, when viewed in conjunction with the evidence heard by the jury at the guilt phase of trial along with the instructions and guilty verdicts, supports the conclusion that the jury found intent at eligibility. Therefore, the meaning of the eligibility verdict and the intention of the jury is clear and requires no speculation on the part of this court. Accordingly, there was a valid death-eligibility finding by the sentencing jury.

Defendant next contends that the jury improperly found him eligible for a death sentence based on the “exceptionally brutal or heinous” statutory aggravating factor contained in section 9–1(b)(7) of the death penalty statute (720 ILCS 5/9–1(b)(7) (West 1998)) because that factor is unconstitutional and unsupported by the evidence. We need not address defendant’s arguments because, regardless of the validity of this aggravating factor, defendant’s eligibility for the death penalty is not altered.

As noted, the jury found defendant eligible for the death penalty based on two separate statutory aggravating factors: (1) “the defendant has been convicted of murdering two or more individuals” (720 ILCS 5/9–1(b)(3) (West 1998)) and (2) “the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty” (720 ILCS 5/9–1(b)(7) (West 1998)). Before a defendant may be sentenced to death in Illinois, the existence of 
one valid
 statutory aggravating factor must be proven beyond a reasonable doubt. See 720 ILCS 5/9–1(b), (f) (West 1998); 
West
, 187 Ill. 2d at 445. It has been recognized by this court that the Illinois death penalty statute does not place special emphasis on any one aggravating factor and does not accord any special significance to multiple aggravating factors as opposed to a single aggravating factor. 
People v. Macri
, 185 Ill. 2d 1, 58 (1998); 
People v. Williams
, 181 Ill. 2d 297, 321 (1998). As such, when a defendant is found eligible for the death penalty under multiple statutory aggravating factors, the eligibility finding may stand despite the invalidation of one of those factors, provided there is a separate, valid aggravating factor that supports the defendant’s eligibility. 
People v. Brown
, 169 Ill. 2d 132, 165 (1996). Because the jury found defendant independently eligible for the death penalty based on the multiple-murder aggravating factor, which we affirm, defendant remains eligible for the death penalty, even if the “exceptionally brutal or heinous” aggravating factor is invalid. See 
People v. Buss
, 187 Ill. 2d 144, 226 (1999).

Moreover, the sentencing judge’s consideration of the “exceptionally brutal or heinous” aggravating factor does not require remand for a new second stage sentencing hearing. Assuming 
arguendo
 the “exceptionally brutal or heinous” aggravating factor is invalid in this case, the sentencing judge, nonetheless, was entitled to consider defendant’s conduct in murdering Christopher in making his sentencing determination. See 
People v. Cole
, 172 Ill. 2d 85, 103 (1996); 
People v. Pasch
, 152 Ill. 2d 133, 189-90 (1992). Such evidence is not reduced by the elimination of the “exceptionally brutal or heinous” aggravating factor. See 
People v. Hampton
, 149 Ill. 2d 71, 92 (1992) (concluding that, although the defendant’s commission of murder in the course of a residential burglary was not sufficient to establish the defendant’s eligibility for the death sentence, the defendant’s conduct in committing that crime could properly be considered at the second phase of the sentencing hearing).

B. 
Denial of Continuance

Defendant asserts that the trial court abused its discretion by denying defendant’s request for a continuance of his capital sentencing hearing. According to defendant, he was prejudiced by the denial of the continuance because his mitigation specialist was left with only two weeks to prepare her report and was unable to make a complete investigation, namely, she was not able to speak with defendant’s friends in the military, Angela’s family or the police.

This court has held that the granting or denial of a continuance is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision unless there has been a clear abuse of that discretion. 
People v. Williams
, 173 Ill. 2d 48, 92 (1996). We find no such abuse by the trial court in this case. On January 30, 1998, almost three weeks before trial, defendant requested a 60-day continuance of the trial to provide his mitigation specialist with additional time to prepare for the capital sentencing hearing. The trial court denied the request, noting that it was “a very old case.” On February 17, 1998, the trial was continued by agreement of the parties to March 9, 1998. As a result of this continuance, the mitigation specialist, Joanne Glass-Watson, did not testify until March 20, 1998, which was close in time to the original 60-day continuance requested by defendant. Through the testimony of Joanne Glass-Watson and Lynn Rittenberg, both licensed clinical social workers, defendant was able to introduce evidence of his childhood, family history, educational history, employment history, religious background, military background, prison records and police reports. In addition, defendant presented further evidence in mitigation through the testimony of defendant’s family members, jail personnel and clergy. They provided testimony as to defendant’s good character and background, including his lack of a criminal history. Defendant has failed to assert how additional conversations with defendant’s friends in the military, Angela’s family or the police would have added to the mitigation evidence presented. Defendant therefore was not prejudiced by the denial of the continuance. See 
People v. Sanchez
, 115 Ill. 2d 238, 262-63 (1986) (determining that the defendant was not prejudiced by the trial court’s denying a continuance of the trial).

In conclusion, the trial court did not abuse its discretion by denying defendant’s request for a continuance. See 
Williams
, 173 Ill. 2d at 91-93 (holding that the denial of defendant’s request for a continuance of the second stage of the capital sentencing hearing was not an abuse of discretion because the mitigation specialist and the other defense witnesses provided extensive mitigation evidence such that further evidence would likely have been cumulative).

C. 
Defendant’s Absence from the Second Phase of the Sentencing Hearing

Defendant argues that the trial court committed error when it allowed him to waive his right to be present in the courtroom during the aggravation and mitigation phase of the sentencing hearing.

This court has held that a defendant can waive his right to be present for a capital sentencing hearing. 
People v. Nielsen
, 187 Ill. 2d 271, 293 (1999). In 
Nielsen
, we held that where a defendant voluntarily absents himself from a courtroom and refuses to be present for further proceedings, he is deemed to have waived his right and cannot claim any advantage on account of his absence. 
Nielsen
, 187 Ill. 2d at 293. Here, the record reveals that defendant freely and voluntarily waived his right to be present for the aggravation and mitigation phase of the sentencing hearing. Before the hearing in aggravation and mitigation, defendant asked the court’s permission to leave the courtroom and not to be present during the remainder of the capital sentencing hearing. After admonishing defendant about his right to be present and allowing defendant to confer with counsel, the trial court granted defendant’s request and accepted his waiver. Defendant later reaffirmed twice that he did not want to be present during the proceedings when asked by the trial court. The record also reveals that the trial judge informed defendant that he was free to return to the courtroom at any time.

Defendant now argues that section 115–4.1(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–4.1(a) (West 1998)) prohibits a defendant from waiving his presence from a capital sentencing hearing under any circumstances. Section 115–4.1(a) provides: “If a defendant absents himself 
before
 trial on a capital felony, trial may proceed as specified in this Section provided that the State certifies that it will not seek a death sentence following conviction.” (Emphasis added.) 725 ILCS 5/115–4.1(a) (West 1998). This court rejected such reliance on section 115–4.1(a) in 
Nielsen
, where we held:

“Section 115–4.1(a) in no way prohibits the sentencing of an absent capital defendant. It prohibits only the commencement of a capital trial against a defendant who absents himself 
before trial
. Defendant did not absent himself before trial. On the contrary, defendant was present throughout his trial, absenting himself only after the jury found him guilty. Accordingly, section 115–4.1(a) is wholly inapplicable to this case.” (Emphasis in original.) 
Nielsen
, 187 Ill. 2d at 294.

As in 
Nielsen
, defendant here was present before and during the trial. In light of our holding in 
Nielsen
, section 115–4.1(a) does not support defendant’s argument. For these reasons, the trial court did not err by conducting the second phase of the capital sentencing hearing in defendant’s absence.

D. 
Victim Impact Statement

Defendant contends that he was prejudiced by the introduction of a victim impact statement from Angela Butler’s father at the sentencing hearing. At the aggravation and mitigation phase of the sentencing hearing, the State sought to introduce a one-page victim impact statement in the form of a signed letter prepared by Angela’s father and Christopher’s grandfather, Dillon Butler, who faxed the letter from his home in Israel. The State excised certain portions from the statement including a comment by Mr. Butler that “Reginald Chapman has shown that he deserves the maximum penalty allowed.” Defense counsel objected to the victim impact statement on the ground that it was more prejudicial than probative because the witness was not there in person to confirm the statement, and the statement was in the form of a faxed and signed letter. The sentencing judge ruled that the State could publish the letter by reading it into the record. Before the statement was read by the assistant State’s Attorney, the sentencing judge specifically stated that he would disregard any improper material contained in the letter and that he would only consider the evidence which is relevant and reliable. The victim impact statement was read as follows:

“It is with a heavy heart and great sorrow that I have prepared this statement. Because of situations beyond my control I am unable to be present at this proceeding, so unfortunately, this statement will have to suffice.

I am Dillon Butler, father and grandfather of the victims of this vile and senseless crime. There are no words that can adequately express my grief and sorrow at the loss of my oldest daughter, Angela, and my first grandchild, Christopher.

My initial shock and anger has given way to a genuine desire to come to grips with this monstrous deed. There is a saying, ‘Time heals all wounds.’ I beg to differ, for when your heart and soul have been pierced as mine has, there is no healing balm, no, not even time, that can assuage the pain of such a loss.

For Angela to have had her life taken at such an early age is truly incomprehensible, but for it to have been done in such a gruesome and heinous fashion is still the more perplexing. She was only twenty years old, with a full and promising life before her. But because of this demonic act she will never have a chance to realize her dreams and aspirations. She will never have the joy of experiencing her child’s growth and development, nor will she ever know the blessings of obtaining wisdom, knowledge, and understanding, things that come with the joy of living a full and right life.

My daughter, Angela, was a warm and caring person, vibrant and full of life, whom at approximately five feet and weighing between ninety-five and one hundred pounds, posed no threat to anyone. As I remember back on her bright and beautiful smile my heart is pained at the thought that I will never see nor speak to her again in this life. And if all this loss and grief weren’t enough, I must then bear the weight of my precious grandson, Christopher, a mere infant of four months, whom has been robbed of the most precious gift that one can receive, life itself.

I constantly ask myself what possible reason could there be for ending his life, and then to have had this demonic act committed in such a horrific manner, adds to my daily distress and agony.

Finally, after much prayer and thought, I can with clear conscience and peace of mind, state to this court in no uncertain terms, that there must be no mercy shown to this nefarious criminal.

I am thankful to have had this opportunity to express to the court my pain and inner feelings at the loss of my precious loved ones, and I pray that this court will honor my request for justice and act accordingly.”

 Defendant now argues that Mr. Butler’s statements that “there must be no mercy shown to this nefarious criminal” and that the sentencing judge “honor my request for justice and act accordingly” improperly influenced the sentencing judge in his decision that no sufficient mitigation existed to prevent the imposition of the death penalty. According to defendant, Mr. Butler’s statements were improper and prejudicial because they expressed his opinion that the death penalty be imposed on defendant.

In 
People v. Howard
, 147 Ill. 2d 103, 155-58 (1991), this court adopted the view announced by the United States Supreme Court in 
Payne v. Tennessee
, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991), allowing the State to present victim impact evidence at a capital sentencing hearing. In so allowing the introduction of victim impact evidence, this court agreed with 
Payne
’s reasoning that for the sentencing authority to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. 
Howard
, 147 Ill. 2d at 158. This court, however, has held that the opinions of witnesses regarding proper punishment in a capital case are irrelevant and therefore inadmissible at a capital sentencing hearing. 
Williams
, 181 Ill. 2d at 324. In the case at bar, the majority of the victim impact statement describes the impact that the murders of Angela and Christopher had on Mr. Butler’s life. Such comments fall squarely within the permissible range of victim impact evidence. We do not view the two comments challenged by defendant as a request that the judge sentence defendant to death. In fact, the section of Mr. Butler’s letter where he expressed clearly his opinion on death as the appropriate penalty for defendant was carefully excised before the statement was read to the court.

Nevertheless, even if the complained-of comments by Mr. Butler indicated an improper opinion on the appropriate penalty, any error was harmless and no prejudice resulted to defendant from their admission. See 
Towns
, 174 Ill. 2d at 469-70 (applying harmless error analysis to improper testimony about the appropriateness of the death penalty by the victim’s relatives). The second phase of defendant’s sentencing hearing was a bench proceeding. This court has held repeatedly that reviewing courts will assume that a trial judge considered only admissible evidence. 
People v. Brown
, 185 Ill. 2d 229, 258 (1998); 
People v. Harris
, 182 Ill. 2d 114, 156 (1998). Here, the sentencing judge did not refer to Mr. Butler’s victim impact statement when imposing defendant’s sentence. Moreover, the sentencing judge stated that he would not consider any improper evidence. The record therefore reveals that the comments by Mr. Butler did not play a role in the sentencing judge’s decision to impose the death penalty in this case. Consequently, the outcome in this case would not have been different had the noted remarks been excluded.

We therefore conclude that the introduction of the victim impact statement during the second phase of the sentencing hearing did not result in reversible error.

E. 
Court’s Comment at Sentencing

At sentencing, the judge remarked that the murders of Angela and Christopher were “preconceived” or “planned.” More specifically, the judge stated: “The manner in which the deaths occurred shows some planning. There is execution of a preconceived idea.” According to defendant, the State never argued at trial or the sentencing hearing that the murders were planned or premeditated. As such, defendant was lulled into a false sense of security that he need not address the question of premeditation or planning because it was not part of the State’s case. Defendant therefore argues that he was deprived of fair notice of this aggravating circumstance. The State responds that defendant’s argument is waived because defendant failed to object to the judge’s comments at sentencing. Defendant counters that plain error review is warranted.

It is well established that failure to preserve an alleged error, by raising a timely objection at trial and identifying the alleged error in a written post-trial motion, constitutes a procedural default of that error on appeal. 
Miller
, 173 Ill. 2d at 191;
 Simms
, 143 Ill. 2d at 170. Here, defendant waived this argument by failing to object to the court’s comment at the sentencing hearing. Nevertheless, this court may review an argument not properly preserved if we determine that plain error affecting a substantial right has occurred. 
Shaw
, 186 Ill. 2d at 326. Before invoking the plain error exception, however, we first determine whether any error occurred. 
Wade
, 131 Ill. 2d at 376.

Initially, we note that this court has held that the State is not required to specify those aggravating factors on which it intends to rely for eligibility. 
Brown
, 169 Ill. 2d at 167. In fact, this court has already rejected a due process notice argument similar to defendant’s current claim. In 
People v. Munson
, 171 Ill. 2d 158, 198 (1996), the defendant argued that, in making the sentencing determination, the trial court relied on aggravating factors found in the death penalty statute as well as aggravating factors found generally in the sentencing statute. The prosecution had not asked the court to consider these factors and the defendant had no notice that the court would in fact consider them. The defendant therefore claimed that he had no opportunity to explain or deny such aggravating factors. In rejecting defendant’s contention that he was denied proper notice that these factors would be part of the sentencing consideration, this court noted that the “sentencing authority is to consider ‘all matters reflecting upon the defendant’s personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.’ ” 
Munson
, 171 Ill. 2d at 198, quoting 
People v. Barrow
, 133 Ill. 2d 226, 281 (1989). In addition, the sentencing body may consider any relevant aggravating factors, statutory and nonstatutory, in the process of selecting among that class of defendant who will actually be sentenced to death. 
Munson
, 171 Ill. 2d at 198. This court concluded that it knew of neither a statutory nor a constitutional mandate which would require the sentencing body, at the close of the evidence, to recite what factors it will consider in sentencing in order to permit a defendant an opportunity to rebut the same. 
Munson
, 171 Ill. 2d at 198-99. The court further concluded that there was nothing in the record to suggest that the trial court’s sentencing determination was based on information that was not known to the defendant. 
Munson
, 171 Ill. 2d at 198.

Defendant urges this court to reconsider 
Munson
 for the reason that it did not address the United States Supreme Court’s decision in 
Lankford v. Idaho
, 500 U.S. 110, 114 L. Ed. 2d 173, 111 S. Ct. 1723 (1991). Defendant’s reliance on 
Lankford
 is misplaced. 
Lankford
 involved an Idaho case where the State advised the defendant in a presentencing order that it would not be seeking the death penalty. During the sentencing hearing, there was no discussion of the death penalty as a possible sentence. Moreover, the defendant argued only the merits of various terms of imprisonment. The trial court, 
sua sponte
, sentenced the defendant to death. The Supreme Court reversed the defendant’s death sentence, holding that the defendant was denied due process because he did not have adequate notice that the judge contemplated the imposition of the death sentence. 
Lankford
, 500 U.S. at 126-27, 114 L. Ed. 2d at 187-89, 111 S. Ct. at 1732-33.

This case presents a very different situation than in 
Lankford
. Here, defendant cannot claim that he was misled into believing that the death penalty was not a possible sentence. Defendant had notice that the death penalty was being requested under two eligibility factors, multiple murder and the exceptionally brutal or heinous murder of a child. When the court articulated the factors in aggravation, it merely commented on the planned and preconceived nature of the murders. In fact, there was evidence introduced during the trial and the sentencing hearing to support this observation by the sentencing judge. In July of 1993, defendant beat up Angela at the Calumet Sag Channel. In the spring of 1994, defendant again beat Angela. In July of 1994, defendant told Angela that “he will kill her and get away with it.” Finally, on August 27, 1994, defendant deliberately met Angela in the Dominicks parking lot, pushed Angela into his car, and took her and Christopher to his apartment, where he beat Angela with his hands, fists, and a baseball bat. Defendant ultimately used electrical cords and weights to sink the bodies of Angela and Christopher in the Calumet Sag Channel. Such evidence indicates planning in the commission of the murders. After hearing such evidence during the trial and the sentencing hearing, defendant cannot assert he was unaware of this evidence or that he did not have notice that it may be considered for purposes of sentencing. Therefore, 
Lankford
 does not control this case.

In addition, this court has already rejected the broad interpretation of 
Lankford
 urged by defendant. In 
People v. Henderson
, 171 Ill. 2d 124 (1996), the defendant argued that the trial judge improperly relied on defendant’s inability to be rehabilitated as a basis for imposing the death penalty. This court rejected defendant’s argument that under 
Lankford
 he was entitled to notice that the trial judge would rely on a “rehabilitative potential” standard. 
Henderson
, 171 Ill. 2d at 139. This court reasoned that, unlike in 
Lankford
, the defendant had notice that the State was seeking the death penalty, such that the defendant was aware that his character, including his rehabilitative potential, could be relied upon by the trial judge in determining his sentence. 
Henderson
, 171 Ill. 2d at 139. Similarly in this case, there is no question that there was notice of the death penalty and that defendant knew of the evidence of premeditation and planning. We therefore reject defendant’s argument that he was deprived of due process. See also 
Brown
, 169 Ill. 2d at 167-68 (rejecting the defendant’s contention that his eligibility is invalid based on lack of notice).

In conclusion, the sentencing judge properly commented on the planned and preconceived nature of these murders such that there was no error in the sentencing judge’s comments. Accordingly, we find no plain error and no basis to excuse defendant’s procedural default.

F. 
Evidence of Defendant’s Early Military Discharge

Defendant argues that the trial court erroneously declined to consider evidence of defendant’s early discharge from the military to care for his wounded brother as mitigating evidence. Thus, defendant argues, he is entitled to a new sentencing hearing.

At his sentencing hearing, defendant presented evidence that, on August 20, 1990, he received an early discharge from the United States Marine Corps in order to assist his brother, who had been recently injured by a gunshot wound to the back. The State, however, proceeded to elicit evidence that, less than a month after his discharge, defendant enrolled in college at Southern Illinois University in Carbondale, although his injured brother lived in Chicago. The State also elicited evidence that, at the time of defendant’s discharge from the military, defendant was training to go to the Persian Gulf, and that this was the time of the “Desert Storm” buildup in the Persian Gulf. During closing argument at the sentencing hearing, the State referenced this evidence and argued that defendant used his brother’s injury as an excuse to leave the military to avoid combat. Before rendering defendant’s sentence, the trial court discussed the aggravating and mitigating evidence presented at the sentencing hearing and, in doing so, stated:

“One of the good deeds admitted was the fact the defendant left the Marines early to take care of his what we now know is temporarily paralyzed brother. However, this is kind of seriously undermined by the fact that he was released from the Marines on August 20, 1990, applied for acceptance for Southern Illinois University which is in Carbondale, which is in the far southern part of the state, on September 15, 1990.”

Defendant argues that the trial court’s statement is not supported by the evidence, and that the trial court erred in failing to consider his early discharge from the military as mitigating evidence.

Defendant waived this argument by failing to object to the statement at the sentencing hearing, and by failing to raise the issue in a post-trial motion. See 
Enoch
, 122 Ill. 2d at 186. Defendant nevertheless argues that we should consider this argument under the plain error doctrine. See 134 Ill. 2d R. 615(a). We first determine whether any error occurred. See 
Wade
, 131 Ill. 2d at 376; see also 
People v. Davis
, 185 Ill. 2d 317, 343 (1998) (stating that, although the defendant waived his claim that the trial court improperly refused to consider certain mitigating evidence at the defendant’s death penalty hearing, we would review the claim for error, as it concerned the fundamental fairness of that proceeding).

The trial court, for sentencing purposes, may not decline to consider relevant and reliable evidence offered in mitigation at a death penalty hearing. See 
Davis
, 185 Ill. 2d at 344 (and cases cited therein); 
People v. Munson
, 171 Ill. 2d 158, 193-94 (1996). Nevertheless, the trial court is not constrained to find such evidence, in fact, mitigating. 
Munson
, 171 Ill. 2d at 194. Indeed, it is not improper for a sentencer to consider a defendant’s evidence presented in mitigation as a factor in aggravation. 
People v. McNeal
, 175 Ill. 2d 335, 369 (1997). “The sentencer and the reviewing court ‘may determine the weight to be given relevant mitigating evidence,’ but ‘may not give it no weight by excluding such evidence from their consideration.’ ” 
Davis
, 185 Ill. 2d at 344, quoting 
Eddings v. Oklahoma
, 455 U.S. 104, 114-15, 71 L. Ed. 2d 1, 11, 102 S. Ct. 869, 877 (1982).

This is not a case where the trial court refused to consider the mitigating evidence offered by defendant. The trial court merely disagreed with defendant’s assessment of that evidence as mitigating. The trial court found that the testimony regarding defendant’s early discharge from the military to care for his wounded brother in Chicago was contradicted by the fact that, less than a month after his discharge, defendant enrolled in college at Southern Illinois University in Carbondale. The trial court made a reasonable inference from the evidence presented at the sentencing hearing, and determined that this piece of evidence presented by defendant in mitigation was not necessarily mitigating. The trial court therefore considered the evidence regarding defendant’s early discharge. It, however, was not constrained to accept defendant’s characterization of this evidence as mitigation. Consequently, we find no plain error and no basis to excuse defendant’s procedural default of this argument.

G. 
Propriety of Death Sentence

Defendant argues that the death penalty is not an appropriate sentence in this case. Defendant argues that his sentence is excessive “given his lack of a criminal record, excellence in his life history and character, and the lack of a significant amount of aggravation aside from the aberrant circumstances of the offense for which he stands convicted.” We point out that “each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty.” 
People v. Johnson
, 128 Ill. 2d 253, 280 (1989). After careful consideration of the circumstances of the crimes in this case and the character of defendant, we conclude that the death penalty is the appropriate penalty in this case.

The following was presented in mitigation at the sentencing hearing. Joanne Glass-Watson, and Lynn Rittenberg, licensed clinical social workers, testified about information that they collected and reviewed regarding defendant’s background. Defendant came from a close, religious family. Defendant was raised in a neighborhood where drugs and gangs were rampant, and yet defendant never succumbed to these problems, despite the fact that both of his older brothers did. Defendant was an industrious and helpful child. Defendant was also the only child to graduate from high school, and he later earned college credits. Defendant served in the United States Marine Corps for two years and was honorably discharged. Defendant held many jobs thereafter. Defendant’s brother informed the social workers that, when defendant was a teenager, he was driving in his neighborhood when he saw a car burning. Defendant stopped and helped the people inside the car escape. He later declined to accept a cash reward for his actions.

Reverend S.L. Gholar testified that he baptized defendant in 1985 at the New Hope Inspirational Church, where defendant’s father was a deacon. Reverend Gholar testified that defendant was a member in good standing at his church and that, when defendant was discharged from the military, defendant taught Sunday school at the church.

Eight family members, including defendant’s father, testified about defendant’s good character and helpful manner. Defendant was religious, interested in furthering his education, never used drugs or alcohol, and never became involved in gangs. Testimony also revealed that defendant had no disciplinary record in jail and that he attended church services at the jail.

In contrast to this mitigating evidence, the testimony from the sentencing hearing revealed that the victim Angela Butler suffered a long history of abuse at the hands of defendant. In July 1993, Angela arrived to work late with a swollen face. Angela informed Denise Thigpen, a coworker, that defendant had beaten her. Two weeks after this incident, Angela told Thigpen that defendant had taken her to a river, which Angela later identified as the Calumet Sag Channel, where he beat her and taunted, “Go ahead and scream, bitch. Nobody ain’t going to hear you.” Defendant refused Angela’s plea to be taken home until she agreed to have sex with him.

In the spring of 1994, defendant pushed Angela down a flight of stairs while Angela held their newborn son Christopher in her arms. Angela could barely walk from the beating. In June of 1994, Angela told her cousin that defendant had slapped her and taken her money and food stamps. Defendant would only return the money and food stamps to Angela when she went to the store, and Angela could not go to the store, or anywhere, without defendant’s permission. In July of 1994, at a time when Angela and defendant had ended their relationship and Angela was engaged to Louis Murillo, Angela told her cousin that she was frightened because defendant “was following her around” and because defendant had told Angela that “he will kill her and get away with it.”

Also in July of 1994, Angela telephoned Denise Thigpen and told her that defendant had beaten her for approximately seven hours. Defendant told Angela that “if he couldn’t have her, that nobody else would. He would kill her.” Defendant placed a barbell on Angela’s chest and left the apartment with Christopher for about five hours. Angela was four feet, six inches tall, and weighed 103 pounds. With the barbell on her chest, Angela was apparently not able to move. When defendant returned, he removed the barbell and went to sleep. Angela escaped by crawling out of a window.

On July 16, 1994, Angela contacted the police after defendant had beaten her and held her captive in his apartment. Angela also reported that defendant had stolen her wallet, which contained her passport, birth certificate, social security card, and public aid card. Defendant had threatened her that “he was going to keep her from being able to do anything.”

In addition to this tragic history of abuse, the circumstances surrounding the murders of Angela and Christopher bespeak the actions of a cold-blooded murderer. On the day that Angela and Christopher disappeared, defendant appeared in the Dominicks parking lot where Angela and Christopher were waiting in a car with Curtis Taylor, while other members of Angela’s fiancé’s family were in the store. Defendant stated that he had spoken to Angela earlier that day and that he was supposed to meet Angela at the store to discuss her upcoming move to Iowa, where her fiancé was attending college. When defendant arrived at the grocery store parking lot, he forced Angela into his car. Defendant drove away with Angela and Christopher in the car. Defendant took Angela back to his apartment, where he struck Angela with his hands and his fists, and where he hit Angela with a baseball bat. As discussed, Angela was four feet, six inches tall, and weighed 103 pounds. Defendant was approximately six feet, four inches tall, and weighed approximately 220 pounds. Defendant bound the bodies of Angela and Christopher with electrical cords; he strapped heavy weights to their bodies; and defendant threw the bodies of Angela and Christopher into the Calumet Sag Channel.

In support of his argument that the death penalty is excessive in this case, defendant cites to cases in which this court has vacated the death penalty where the defendant had no significant criminal history and acted in response to mental or emotional disturbances. See, 
e.g.
, 
People v. Leger
, 149 Ill. 2d 355 (1992); 
People v. Buggs
, 112 Ill. 2d 284 (1986); 
People v. Carlson
, 79 Ill. 2d 564 (1980).

In 
People v. Carlson
, 79 Ill. 2d 564 (1980), the defendant was convicted of the murders of his ex-wife and a police officer. The defendant and his wife, after 19 years of marriage, divorced three months prior to the murders. The defendant and his ex-wife had planned to remarry, but his ex-wife then told the defendant that she had a new boyfriend. Soon after learning of this news, the defendant shot and killed his ex-wife and set fire to her home. When the police later tried to arrest the defendant, he shot and killed one of the officers. The defendant testified that he was attempting to commit suicide when he accidentally shot the police officer. Testimony revealed that the defendant had been suffering from severe emotional and physical problems before the shootings. 
Carlson
, 79 Ill. 2d at 570-75.

Next, in 
People v. Buggs
, 112 Ill. 2d 284 (1986), the defendant was convicted of the murders of his wife and one of their children. The defendant and the wife were arguing about the wife’s infidelity when the wife told the defendant that he was not the father of two of their sons. At that point, the defendant poured gasoline on his wife and the stairs and lit a match. The defendant’s wife and one of their children died in the fire. The defendant had a history of alcohol-related problems, including blackouts. A psychiatrist testified that the defendant suffered from an “Isolated Explosive Disorder” at the time of the offenses. 
Buggs
, 112 Ill. 2d at 287-89.

Finally, in 
People v. Leger
, 149 Ill. 2d 355 (1992), the defendant shot and killed his estranged wife five days before the finalization of their divorce. Later that same night, the defendant shot and killed his former wife and shot his former wife’s new husband. Testimony revealed that the defendant had a history of drinking problems, including blackouts. Testimony also revealed that, on the date of the offenses, the defendant was taking 10 different prescription drugs, including antianxiety medication and medication containing codeine and librium. Experts testified that these medications could affect a person’s ability to reason. 
Leger
, 149 Ill. 2d at 365-66, 412.

These cases are distinguishable from the instant case. There is no evidence here that defendant suffered from any mental or emotional problems, or that defendant was under the influence of alcohol or drugs at the time of the murders. Defendant argues that he “was acting under extreme emotional distress when he killed Christopher, a distress which resulted from the killing of Angela, which itself was an unplanned, sudden-act, murder arising out of rage and anger and done during their argument” regarding Angela’s upcoming move to Iowa with their son. This argument is not persuasive. At the time of the murders, defendant and Angela had ended their relationship and defendant was living with his new girlfriend, who was pregnant with his child. Nevertheless, defendant was “following Angela around.” When defendant beat Angela, he warned her that “if he couldn’t have her, that nobody else would. He would kill her.” The murders in this case were the culmination of an escalating history of violence by defendant against Angela, not a “sudden-act” murder. Defendant’s suggestion that his culpability should be diminished because he murdered Christopher while he was under the emotional distress of having just murdered Angela is wholly repugnant, and we will not consider it.

This case is analogous to 
People v. Heard
, 187 Ill. 2d 36 (1999). In 
Heard
, when the defendant’s girlfriend, Natalie, ended their relationship, defendant began to harass Natalie and her new boyfriend. Defendant threatened to kill Natalie and her new boyfriend if they did not “ ‘leave each other alone.’ ” 
Heard
, 187 Ill. 2d at 85. Defendant threatened that “ ‘nobody is going to have Natalie because Natalie is mine.’ ” 
Heard
, 187 Ill. 2d at 88. On one occasion, the defendant stole all of Natalie’s clothes from her apartment. Natalie let the defendant into her apartment when the defendant offered to return the clothes, and defendant proceeded to batter Natalie. Ultimately, the defendant broke into Natalie’s apartment and shot and killed Natalie, Natalie’s new boyfriend, and Natalie’s cousin. 
Heard
, 187 Ill. 2d at 85-86.

The defendant was sentenced to death for the murders and argued on appeal that the death penalty was not an appropriate sentence. The mitigating evidence presented in that case included testimony and affidavits from family, friends, business associates, prior teachers, and jail personnel. These individuals described the defendant as hardworking, caring, and nonviolent. The defendant’s family was described as close, supportive, and religious. Some witnesses recounted specific instances where the defendant helped them during a financial or emotional crisis. Other witnesses recounted that the defendant was never involved in a gang and did not use drugs or alcohol. 
Heard
, 187 Ill. 2d at 52.

Although the defendant had no significant criminal history, we held that his actions in the case “reveal a person with an evil heart.” 
Heard
, 187 Ill. 2d at 86. We also noted that there was no evidence that the defendant suffered from any mental or emotional problems, nor was there evidence that the defendant was under the influence of alcohol or drugs at the time of the murders. The defendant’s relationship with Natalie had been over for months, and the defendant was engaged to another woman at the time of the murders. The murders were the culmination of an escalating history of violence by the defendant against the victims, not a spontaneous reaction to information such as the infidelity of a spouse. 
Heard
, 187 Ill. 2d at 88. Thus, after reviewing the defendant’s character and the circumstances of the crimes, we affirmed the defendant’s sentence of death. 
Heard
, 187 Ill. 2d at 85-89.

Likewise, as we have discussed, the murders in this case were the culmination of an escalating history of violence by defendant against Angela. Although defendant has no significant criminal history, his actions in this case, actions that are tragically similar to the actions of the defendant in 
Heard
, reveal a person with an evil heart.

Defendant nevertheless argues that the murders in this case were “the product of an impulsive mind.” In support, defendant cites to the fact that in May 1995, defendant underwent a psychiatric evaluation and was found unfit to stand trial. According to the psychiatric report, “[Defendant] had the mental capacity to understand and knowingly waive Miranda rights at the time he was subject to interrogation. At the present time, due to the severity of his mental illness, he is unable to cooperate with counsel in preparing his defense. This is due to his extreme mood depression, psychomotor retardation, and improvised thinking processes as well as suicide ideation.” Two months later, on July 12, 1995, defendant underwent another psychiatric evaluation and was found fit to stand trial, provided he continue to receive certain medications used to treat depression, sleep difficulties, and psychosis. The psychiatric report also stated that defendant “was legally sane at the time of the alleged offense” and that there “is no indication that he [defendant] was suffering from any major mental disorder at the time of the alleged offense.” Finally, defendant was evaluated on September 5, 1996, and was found fit to stand trial provided he continue to receive certain medications used to treat depression and psychosis. Again, the psychiatric report stated that there “is no indication that [at the time of the offenses] the defendant was suffering from a mental disorder or defect which would have substantially impaired his ability to understand the criminality of his act or to conform his behavior with the requirements of the law.”

These reports do not contain any evidence that defendant was suffering from any psychological problems at the time he murdered Angela and Christopher. In fact, the reports state just the opposite. The first evaluation occurred in May 1995, more than eight months after the murders. The reports express no opinion as to whether defendant’s psychological problems existed before defendant’s arrest in this case or were the result of facing a trial for the murders and the possibility of the death penalty. The record reveals no evidence that defendant was acting under emotional distress when he murdered Angela and Christopher. Indeed, the facts surrounding the crimes bespeak the actions of a cold-blooded murderer. After careful review of the circumstances of the crimes in this case and the character of defendant, we conclude that the death penalty is the appropriate penalty in this case.

H. 
Constitutionality of the Illinois Death Penalty Statute

As a final matter, defendant raises several challenges to the constitutionality of the Illinois death penalty statute (720 ILCS 5/9–1 (West 1998)). This court has already considered and rejected each of defendant’s arguments. This court has held that the death penalty statute does not place an unconstitutional burden of proof on the defendant that precludes meaningful consideration of mitigation. 
Gilliam
, 172 Ill. 2d at 522; 
Munson
, 171 Ill. 2d at 203-05. We also have held that the death penalty statute is not unconstitutional for allowing the sentencer to consider “any other reason” a defendant should be sentenced to death. 
People v. Johnson
, 182 Ill. 2d 96, 112-13 (1998); 
People v. Taylor
, 166 Ill. 2d 414, 439 (1995). Further, we have rejected claims that the statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. 
Gilliam
, 172 Ill. 2d at 522; 
Munson
, 171 Ill. 2d at 205-06. Because defendant does not set forth any compelling reason for reconsidering these holdings, we adhere to our prior decisions. We also reject defendant’s contention that individual features of the death penalty statute, which this court has found constitutional, when considered in their totality, render the statute unconstitutional. See 
Johnson
, 182 Ill. 2d at 113; 
Munson
, 171 Ill. 2d at 205-06.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. We direct the clerk of this court to enter an order setting Tuesday, March 20, 2001, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

Affirmed
.

JUSTICE FREEMAN, specially concurring:

I agree with court that defendant’s convictions and sentence must be affirmed. I write separately, however, because I do not agree with court’s analysis concerning the omission of the 
mens rea
 from the eligibility verdict. See slip op. at 32-36. I, therefore, do not join in that portion of the court’s opinion.

Defendant argues that his death-eligibility verdict form contains the same defect as that found to necessitate vacatur in 
People v. Mack
, 167 Ill. 2d 525 (1995). In 
Mack
, the defendant was convicted of murder in a bench trial. The sentencing hearing was conducted before a jury. At the conclusion of the sentencing hearing, the jury returned a felony-murder eligibility verdict that omitted the required 
mens rea
. This court, in examining the validity of the eligibility verdict, acknowledged the critical importance of the mental state to a finding of death eligibility. 
Mack
, 167 Ill. 2d at 533. The court also warned that the process of interpreting a jury’s verdict “should not become a speculative attempt to reconstruct the jury’s deliberations and divine its unexpressed conclusions.” 
Mack
, 167 Ill. 2d at 536-37. The jury in 
Mack
 never expressed a conclusion as to whether the defendant possessed the required mental state and, as a result, the eligibility verdict was legally insufficient.

In this case, the parties do not dispute that the verdict at issue attempted to set forth the statutory aggravating factor, but failed to do so completely, omitting an essential element. Therefore, pursuant to 
Mack
, the verdict is deficient. Nevertheless, the court today rejects defendant’s claim, because, unlike the situation in 
Mack
, “[t]he jury’s eligibility verdict, when viewed in conjunction with the evidence heard by the jury at the guilt phase of trial along with the instructions and guilty verdicts, supports the conclusion that the jury found intent at eligibility.” Slip op. at 36. Unlike the justices in the majority, however, I do not believe that the strength of the evidence is what distinguishes this case from 
Mack
 and, hence, precludes review under plain error. As the United States Supreme Court has held, an insufficient verdict cannot be deemed harmless error based upon the strength of the evidence. 
Sullivan v. Louisiana
, 508 U.S. 275, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993); see also 
People v. Williams
, 193 Ill. 2d 1, 42 (2000) (plurality opinion of McMorrow, J., joined by Freeman and Rathje, JJ.).

In the case at bar, the same jury which found defendant eligible for the death penalty also heard the evidence during the guilt phase of the trial. At the conclusion of the guilt phase of the trial, that jury was instructed 
on only one theory
–intentional or knowing murder. Therefore, the verdict returned by the jury after the guilt phase of the trial must be viewed as a finding of guilt of either intentional or knowing murder. In other words, because of the way the jury was instructed, the general verdict leaves us without doubt that defendant was convicted on either a theory of knowing or intentional murder. As a result, we need not engage in speculation in order to interpret the verdict in this case.

Support for this analysis can be found in this court’s recent decision in 
People v. McCallister
, 193 Ill. 2d 63 (2000). There, at the conclusion of the guilt phase of the defendant’s trial, the jury returned a specific verdict finding the defendant guilty of intentional or knowing murder. At the conclusion of the eligibility phase of the trial, the same jury returned an eligibility verdict containing the same deficiency as that in 
Mack
. On appeal, defendant McCallister argued that 
Mack
 compelled the vacatur of his death sentence. We disagreed, stating that

“the principal concerns animating our decision in 
Mack
 are not present ***. We need not speculate as to whether the jury found that defendant acted with the requisite 
mens rea
 because the jury did, in fact, make that determination at the guilt-innocence phase of trial. Nor do we need to substitute our judgment for that of the jury to find the defendant death eligible because, again, the jury made the requisite finding regarding defendant’s 
mens rea
. Consequently, although the omission of the mental state from the eligibility verdicts was error, we cannot say that the omission was so fundamental a defect that it amounted to plain error. 
People v. Childress
, 158 Ill. 2d 275 (1994) (omission of mental state from felony-murder eligibility verdict not reversible error where same jury returned finding at guilt phase that defendant was guilty of knowing or intentional murder).” 
McCallister
,193 Ill. 2d at 106-07.

As was the case in 
McCallister
, our “interpretive process” (
Mack
, 167 Ill. 2d at 536) here need not devolve into “a speculative attempt to reconstruct the jury’s deliberations and divine its unexpressed conclusions.” 
Mack
, 167 Ill. 2d at 536-37. Unlike a general verdict returned at the conclusion of the guilt phase of the trial by a jury after being instructed on all theories of murder (intentional, knowing, and felony murder), this verdict leaves no doubt that the jury found the required 
mens rea
 beyond a reasonable doubt. As in 
McCallister
, because the same jury heard both the guilt-innocence phase and eligibility phase of the trial, and because that jury returned an unequivocal finding of the requisite 
mens rea
 at the guilt-innocence phase of the trial, the omission of that 
mens rea
 from the eligibility verdict is not so fundamental a defect that it constitutes plain error. Thus, because the jury did, in fact, find the necessary mental state to sustain defendant’s death eligibility, there is no reasonable probability that the outcome of the eligibility hearing would have been different had trial counsel objected to the verdict forms. 

In all other respects, I concur in the court’s opinion.

JUSTICE McMORROW joins in this special concurrence.

CHIEF JUSTICE HARRISON, dissenting:

Under the Constitution and statutes of Illinois, law enforcement officials are prohibited from interfering with an attorney’s attempt to access and assist his client. 
People v. McCauley
, 163 Ill. 2d 414 (1994). When an attorney has advised police that he has been appointed or retained to represent a suspect in police custody and is attempting to contact his client, the police must discontinue questioning, notify the suspect of the attorney’s efforts to render assistance, and permit the attorney to consult with the suspect. If the police proceed with questioning without advising the suspect of the attorney’s efforts and without allowing the attorney to speak to the suspect first, any incriminating statements made by the suspect during the ensuing interrogation are deemed involuntary and must be suppressed. 
McCauley
, 163 Ill. 2d at 445-46.

Contrary to the majority, I do not believe that this rule should be limited to situations where a suspect’s attorney is physically present at the site of the interrogation. Once police are advised that an attorney has been appointed or retained to represent a suspect in custody and that the attorney would like to consult with the suspect, questioning should cease. That is so whether the attorney is at the door of the police station or calling from his home, office or cell phone. See 
People v. Milestone
, 283 Ill. App. 3d 682, 686 (1996); 
Commonwealth v. Mavredakis
, 430 Mass. 848, ___, 725 N.E. 2d 169, 179 (2000); 
State v. Stoddard
, 206 Conn. 157, 537 A.2d 446 (1988); 
Haliburton v. State
, 514 So. 2d 1088 (Fla. 1987). As long as the attorney has used reasonable means to give notice to the police, the particular method employed by the attorney to give such notice is logically and legally irrelevant.

The rights protected by this rule are fundamental. The administrative challenges it poses are insignificant. Application of the rule will require law enforcement officials to track the location of suspects in custody so that they can be reached and notified if attorneys inquire after them. That should not be problematic, however, in any but the largest metropolitan areas. Even there, affordable technology exists to enable police to identify where every suspect is during his or her detention.

If police are concerned that individuals will begin impersonating defense lawyers, they are free to implement policies for identifying and verifying that individuals representing themselves as attorneys are, in fact, attorneys. See
 Mavredakis
, 430 Mass. at ___ n.15, 725 N.E.2d at 179 n.15. Lawyers could, for example, be required to fax copies of their bar cards and drivers’ licenses to the police station. Alternatively, police could demand that attorneys appear at the police station in person within a reasonable time after telephonic notice is given. Police would be required to suspend questioning during that interval, but if the attorney failed to appear before the time expired, questioning could resume.

By requiring counsel to be physically present at the site of the interrogation, the majority invites police misconduct. If law enforcement officers are free to continue interrogation until the lawyer appears in person at the station house where the suspect is being held, what will happen is obvious. Police will resort to subterfuge and prevarication to delay counsel’s discovery of his client’s whereabouts for as long as possible. Their goal, in every case, will be to extract a confession faster than the attorney can track the client down and intercede.

The exercise of constitutional rights should not turn on a footrace to the police station. To hold otherwise, as the majority does, reflects a basic and unwarranted distrust for the role of lawyers in our criminal justice system. We wrote in 
McCauley
, 163 Ill. 2d at 446, that

“ ‘[n]o system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, [his] rights.’ (Emphasis omitted.) [Citation.] If our system is, indeed, such a system, we have no reason to fear both lawful and protected consultation.”

I, for one, continue to believe in the wisdom of this rule. Accordingly, I would hold that the circuit court should have suppressed not only the statements made by defendant after his attorney arrived at the police station, but also the statements defendant made after police rebuffed his attorney’s attempts to reach him by telephone. Those statements, which included defendant’s confession, should not have been presented to the jury, and their admission did not constitute harmless error. Defendant should therefore be granted a new trial.

Even if defendant were not entitled to a new trial, his death sentence could not be allowed to stand. For the reasons set forth in my partial concurrence and partial
 dissent in
 People v. Bull
, 185 Ill. 2d 179 (1998)
, the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). Defendant’s sentence of death should therefore be vacated, and the cause should be remanded to the circuit court for imposition of a sentence of imprisonment. 720 ILCS 5/9–1(j) (West 1998). Because defendant was an adult and one of his victims was under the age of 12, or, in the alternative, because defendant was found guilty of murdering more than one victim, the term of his imprisonment must be natural life. 730 ILCS 5/5–8–1(a)(1)(c)(ii) (West 1998).