THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERNON WOODS, Defendant-Appellant.

First District (3rd Division)    No. 1—01—3661

Opinion filed March 19, 2003.

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, John E. Nowak, and Gregg Gansmann, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

Defendant, Vernon Woods, was charged with two counts of first-degree murder in the death of seven-month-old Tiywon J. Austin, who died as a result of "shaken baby syndrome" injuries. Prior to trial, a two-day hearing was held on defendant's motion to suppress statements. At the hearings, defendant argued that his constitutional rights were violated when police officers prevented him from seeing a note that an attorney left for him at the police station where he was being held in custody. The motion was denied. On August 15, 2001, following a jury trial, defendant was found guilty of involuntary manslaughter. On September 26, 2001, defendant was sentenced to 18 years' imprisonment. Defendant's motion to reconsider sentence was denied and this appeal followed.

On appeal, defendant contends that: (1) the trial court erred in denying his motion to suppress statements; (2) the State's rebuttal closing arguments deprived him of a fair trial; and (3) his rights to due process and trial by jury under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), were violated when the trial court enhanced the Class 3 felony of involuntary manslaughter to a Class 2 felony, based on a judicial finding that the victim was a family member. For the reasons that follow, we reverse and remand.

## FACTUAL BACKGROUND

Tiywon J. Austin was born on February 9, 1999. Approximately four weeks later, on March 18, 1999, he was severely injured and on September 2, 1999, he died from complications arising from his injuries. Niki Garrett is Tiywon's mother and his father is defendant. Garrett and defendant had terminated their relationship when she became pregnant with Tiywon. Nonetheless, once Tiywon was born, Garrett and defendant had an arrangement whereby defendant would care for Tiywon on the weekends.

■ The following facts presented at the suppression hearing and trial are relevant to our determination as to whether defendant's statements were voluntary.[1] On Friday, November 5, 1999, at approximately 1 p.m., Agents Rovirdes Delaney and Zeniah Ward-Hudson[2] brought defendant to the Broadview police station for questioning regarding the circumstances surrounding Tiywon's death. At about 2:49 p.m., defendant was read his *Miranda* rights, he signed a waiver form and agreed to give a written statement. Delaney handed defendant a pen and pad and asked defendant to make a written statement, in his own words, regarding the events surrounding Tiywon being injured on March 18, 1999.

In his statement, defendant claimed that during the morning on the date of the incident, Tiywon kept crying. Defendant stated that his girlfriend, Alicia May, asked him if Tiywon had a bowel movement. He answered no. May gave Tiywon an enema, which caused him to have a bowel movement. Tiywon went to sleep and May left for work. An hour later, Tiywon was crying again. Defendant wrote that he tried to put Tiywon back to sleep by patting him on the back, by walking him and talking to him. It did not work. Defendant wrote that he then gave Tiywon another enema. Tiywon kept crying. Defendant laid Tiywon down, still crying and hollering, while he finished cleaning the kitchen. Defendant wrote that he went to pick Tiywon up and Tiywon hollered one loud scream and passed out. Defendant and his aunt's boyfriend, Tommy Nutall, called an ambulance and Tiywon was taken to the hospital.

Delaney testified that after he received defendant's written state-

---

[1] Where a defendant asks a reviewing court to review the trial court's decision on the motion to suppress, the reviewing court may consider not only the evidence presented at the suppression hearing, but also the evidence introduced at trial. *People v. Kidd*, 175 Ill. 2d 1, 25, 675 N.E.2d 910 (1996); *People v. Caballero*, 102 Ill. 2d 23, 34-36, 464 N.E.2d 223 (1984).

[2] Agents Delaney and Ward-Hudson were Illinois State Police officers assigned to the Illinois Department of Children and Family Services Child Abuse and Homicide Task Force.

ment, he and Ward-Hudson reviewed the statement with defendant. Delaney told defendant that his statement did not account for the injuries Tiywon sustained. Defendant denied shaking, dropping, or hitting Tiywon. At 6:45 p.m., defendant requested to speak with Delaney. According to Delaney, during this interview, defendant changed his story and stated that he had laid Tiywon down on the living room couch when he went to clean the kitchen and that Tiywon probably hit his head on the coffee table when he fell off the couch.

Delaney terminated the interview and called the assistant State's Attorney (ASA). The ASA arrived at the station the next day, early Saturday morning, November 6, 1999, at approximately 2 a.m. Delaney testified that he was not present for defendant's interview with the ASA and Ward-Hudson, because defendant had specifically asked to speak to Ward-Hudson. After the interview, the ASA refused to approve charges. Defendant was interviewed again and the ASA was contacted a second time. Delaney testified that the State's Attorney's office still refused to approve charges.

Delaney testified that at 3:52 a.m., defendant again requested to speak to him. Defendant wanted to add to his earlier statement and wanted to speak to his girlfriend, Alicia May. According to Delaney, defendant stated that he was in the kitchen preparing a baby bottle while holding Tiywon, when Tiywon slipped from his hand and hit the kitchen table, chair and floor. Defendant stated that he called Tiywon's name and shook him because Tiywon looked like he was knocked out after he hit the floor. Delaney testified that when the ASA arrived to take defendant's statement, defendant stated that he wanted to speak with Alicia May, not the ASA. The ASA responded that he was there to take a statement and to call him when defendant was ready to give a statement. The interview was then terminated.

Attorney John F. Nocita testified that on November 5, 1999, he was contacted by defendant's girlfriend, Alicia May. Nocita testified that May wanted him to represent defendant, who was then being held in custody at the Broadview police station. On Saturday afternoon, November 6, 1999, at about 2 p.m., Nocita went to the Broadview police station to speak to defendant.

When Nocita asked the desk officer on duty if he could speak to defendant, the desk officer left her desk to confer with another officer. The desk officer returned and informed Nocita that defendant's case was a State Police case and since the state investigators were not at the station, he could not see defendant. The desk officer told Nocita that the state investigators would return to the station later that night.

Nocita then asked the desk officer for a piece of paper. Nocita

testified that he wrote a full-length-of-paper note to defendant telling defendant that he was a lawyer and advising defendant not to talk to anyone without an attorney being present. Nocita testified that the desk officer agreed to give the note to defendant and agreed to give a copy of the note along with his business card to the state investigators.

Nocita estimated that he stayed at the Broadview police station for about 50 minutes. He testified that when he left the police station, he did not return and he was never contacted by defendant or the State Police that weekend. Nocita subsequently represented defendant at his preliminary hearing.

Delaney testified that when he returned to the Broadview police station on Saturday evening, November 6, 1999, at about 7 p.m., he was informed that earlier that afternoon an attorney had been at the station asking to speak to defendant and that the attorney had left his business card and a note. According to Delaney, after he received the attorney's business card and read the note, he discussed the matter with his fellow agents and it was decided that defendant should be informed that an attorney had been to the police station to see him. Delaney testified that he never gave Ward-Hudson any specific instructions regarding the business card or note. He testified that he only told Ward-Hudson to advise defendant that an attorney had been to the police station to see him and that arrangements could be made for him to call the attorney. Delaney testified that he did not personally pass this information on to defendant, because defendant chose to speak with Ward-Hudson.

Delaney testified that he threw Nocita's note away, but before he disposed of the note, he showed it to his fellow agents. He conceded that his police report contained a notation regarding Nocita's business card, but not the attorney's note. Delaney also acknowledged that in his records pertaining to the conversations he had with the ASA, there is a notation indicating that the ASA told him that he should not talk to defendant if defendant had an attorney. Delaney could not remember if he told the ASA about the note. Delaney also conceded that his information log indicated that on Saturday morning, November 6, 1999, at 4:09 a.m., defendant requested to make a telephone call and that defendant was not allowed to make that phone call.

Delaney testified that early Sunday morning, on November 7, 1999, at about 12:15 a.m., defendant again requested to speak with him. According to Delaney, defendant wanted to tell the full story. Delaney testified that defendant basically gave the same story about accidentally dropping Tiywon and then shaking him in an attempt to

revive him. Delaney typed the statement and asked defendant to sign the statement. Defendant responded that he would sign the statement if he could call his girlfriend since he had never explained to her exactly what happened. Defendant refused to sign the statement and the interview was terminated.

Agent Ward-Hudson testified that the first time she interviewed defendant alone was after he had already been interviewed by herself and Delaney. This interview occurred early Saturday morning, on November 6, 1999, at about 2 a.m. Ward-Hudson testified that defendant told her that Tiywon had probably hurt himself when he fell off the living room couch and hit his head on a coffee table. Defendant then gave the same statement to the ASA. Ward-Hudson testified that the ASA left after telling defendant that his statement did not account for Tiywon's injuries.

Later that Saturday evening, on November 6, 1999, at about 7:40 p.m., Ward-Hudson returned to the Broadview police station, bringing food and toiletries for defendant. Delaney was already at the station. Ward-Hudson testified that Delaney told her that an attorney had come to the police station to see defendant and had left his business card. Ward-Hudson testified that Delaney informed her that when she spoke with defendant to tell defendant that an "attorney was there and if he wanted to talk to him, he was free to talk to him." Ward-Hudson testified that when she went to the holding cell to speak with defendant she told him that an "attorney had been there. He had left his name and phone number, and that if he wanted to talk to him, [she] could make arrangements for him to do that, but that [she] would not be able to speak with him after that." According to Ward-Hudson, defendant stated that he wanted to talk to her.

Ward-Hudson testified that defendant told her that he had given Delaney a "bullsh-t" statement and wanted to tell her what actually happened. Defendant stated that he was in the kitchen holding Tiywon, when Tiywon slipped out of his hands and hit his head on a table and then on the floor. Defendant stated that he was unable to catch Tiywon before he hit the table and floor. He stated that he then shook Tiywon in an attempt "to wake him up" and that he did not "mean to shake the baby as hard as he did." Ward-Hudson gave defendant a stuffed animal and asked him to demonstrate how he shook Tiywon. Defendant picked up the stuffed animal with both hands and shook it lightly. Defendant was then told that his demonstration was not forceful enough to cause the injuries that Tiywon sustained. Defendant then shook the stuffed animal with more force. Afterwards, defendant's oral statement was written out, typed, and signed by defendant. The statement was dated November 8, 1999, at 1:45 a.m.

On cross-examination, Ward-Hudson testified that when she spoke to defendant in his holding cell, she did not inform him that the attorney who came to see him at the police station had left a note for him. She testified that she never saw the attorney's note and that neither Delaney nor anyone else ever informed her of the note. Ward-Hudson also acknowledged that the Broadview police department's complaint control form and detention report indicated that defendant was not allowed to make any telephone calls.

After hearing arguments, the trial court, citing to *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964), determined that defendant's constitutional rights were violated. The trial court, however, further determined that the constitutional violations were cured when defendant made incriminating statements after the State Police informed defendant that an attorney had been to the Broadview police station to see him, the police gave defendant the attorney's business card, and defendant was again "Mirandized." The trial judge stated, "I say once Investigator Hudson tells [defendant], 'Here's the lawyer's card. The lawyer was here to see you.' [Defendant] is then sufficiently informed and can make an intelligent decision then as to waive his Miranda rights or talk to the lawyer."

## ANALYSIS

### I. Suppression of Statements

Defendant first contends that the trial court erred in denying his motion to suppress statements where the trial court determined that the violations to his constitutional rights were cured. In response, the State concedes that the Broadview police officers' decision not to allow Nocita access to defendant violated defendant's constitutional rights under *People v. McCauley*, 163 Ill. 2d 414, 645 N.E.2d 923 (1994). The State, however, goes on to argue that the case at bar is factually distinguishable from *McCauley* and, therefore, we should affirm the trial court's judgment denying defendant's motion to suppress statements. We must reject the State's argument.

Since neither side disputes the relevant facts, we conduct *de novo* review of the trial court's application of the law to these uncontested facts. *People v. Chapman*, 194 Ill. 2d 186, 208, 743 N.E.2d 48 (2000); *People v. Rodriguez*, 324 Ill. App. 3d 468, 469, 754 N.E.2d 393 (2001). A defendant's right against self-incrimination is protected by article I, section 10, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 10)[3]. This right includes the right to an attorney. *McCauley*, 163 Ill. 2d at 421. A defendant may waive these rights provided

___

[3]Article I, section 10, of the Illinois Constitution of 1970 provides: "No

the waiver is voluntary, knowing and intelligent. *McCauley*, 163 Ill. 2d at 421; *Chapman*, 194 Ill. 2d at 208. In determining whether a defendant knowingly and intelligently waived his right to an attorney, a court considers the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation. *McCauley*, 163 Ill. 2d at 421-22; *Chapman*, 194 Ill. 2d at 208. The State bears the burden of proving, by a preponderance of the evidence, that the defendant made a voluntary, knowing and intelligent waiver of his rights. *McCauley*, 163 Ill. 2d at 422; *Chapman*, 194 Ill. 2d at 208-09.

■ In addition, the right to assistance of counsel is protected by the due process guarantee in article I, section 2, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2)[4]. *McCauley*, 163 Ill. 2d at 425-26, 441-46. Due process requires " 'fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections.' [Citation.]" *McCauley*, 163 Ill. 2d at 441. Due process contemplates that police act in an accusatorial, not an inquisitorial, manner. *McCauley*, 163 Ill. 2d at 441.

Basically, three Illinois Supreme Court decisions control the resolution of this case: *McCauley*, *Chapman*, and *People v. Smith*, 93 Ill. 2d 179, 442 N.E.2d 1325 (1982).

*McCauley* involved the taking of a custodial suspect's statement while an attorney retained by defendant's family was prevented from consulting with defendant. In *McCauley*, the defendant was brought to the police station for questioning in connection with a murder. Defendant was read his *Miranda* rights but he did not request an attorney. Unbeknownst to defendant, his family had retained an attorney for him. When the attorney arrived at the police station and requested to see defendant, the police refused to allow the attorney to see defendant and also failed to inform defendant that the attorney

---

person shall be compelled in a criminal case to give evidence against himself nor be twice put in jeopardy for the same offense." The state constitutional privilege against self-incrimination has its federal counterpart in the fifth amendment, which provides: "No person *** shall be compelled in any criminal case to be a witness against himself ***." U.S. Const. amend. V. The fifth amendment right to counsel, also known as the *Miranda* right to counsel, applies strictly to custodial interrogations and attaches whether or not formal judicial proceedings have been initiated. See *People v. Fayne*, 283 Ill. App. 3d 382, 390, 669 N.E.2d 1172 (1996).

[4]Article I, section 2, of the Illinois Constitution of 1970 provides: "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

was present at the station and seeking to consult with defendant. *McCauley*, 163 Ill. 2d at 419. Defendant subsequently made incriminating statements. The supreme court affirmed the trial court's suppression of defendant's statements. *McCauley*, 163 Ill. 2d at 446.

The *McCauley* court held that under the facts and circumstances of the case, the police violated defendant's right to counsel under article I, section 10, by failing to tell defendant that his attorney was present at the station and by refusing to allow the attorney to see defendant. *McCauley*, 163 Ill. 2d at 439-45. The supreme court also concluded that defendant's statement was obtained in violation of his due process rights under article I, section 2, when the police interfered with defendant's right to his attorney's assistance. In this regard the supreme court stated:

> "While we recognize that an accused alone invokes the right to counsel, we are unwilling to dismiss an available retained or appointed attorney's efforts to gain access to his suspect-client as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice to relinquish his right to the attorney's presence." *McCauley*, 163 Ill. 2d at 445.

*McCauley* was followed by *Chapman*. In *Chapman*, while defendant was being questioned in connection with a homicide investigation, his attorney called the station and spoke briefly with an officer. *Chapman*, 194 Ill. 2d at 206. The attorney hung up the phone and drove to the police station. Before the attorney arrived at the police station, the defendant made an incriminating statement. When the attorney arrived at the station, he was denied access to defendant. Defendant subsequently made further incriminating statements. The supreme court affirmed the trial court's decision admitting the statement defendant made before his attorney arrived at the police station and suppressing the statements defendant made after his counsel arrived at the police station. *Chapman*, 194 Ill. 2d at 208.

Citing *McCauley*, the *Chapman* court stated:

> "[A] defendant's state constitutional rights [are] violated where the police [deny] the attorney retained for the defendant *physical* access to the defendant during interrogation, and where the police [do] not inform the defendant that the attorney was seeking to consult with him *at the police station*." (Emphasis in original.) *Chapman*, 194 Ill. 2d at 211.

The supreme court in *Chapman* concluded that its holding struck the appropriate balance between the State's interest in effective crime investigation and a suspect's state constitutional rights to due process and against self-incrimination under sections 2 and 10 of article I of the Illinois Constitution of 1970. *Chapman*, 194 Ill. 2d at 213.

■ Thus, *McCauley* and *Chapman* hold that a defendant's constitutional rights are violated when officers fail to tell defendant that his attorney was present at the station and when officers deny defendant access to his attorney who is physically present at the police station and ready to counsel defendant. In the present case, defendant's attorney was physically present at the Broadview police station and the attorney was ready and prepared to counsel defendant. Therefore, under the rationale set forth in *McCauley* and *Chapman*, defendant's constitutional rights were violated when the officers at the Broadview police station refused to allow defendant access to Nocita.

■ The State contends that despite these constitutional violations, this court should affirm the trial court's judgment denying defendant's motion to suppress statements because defendant was not being interrogated at the time Nocita arrived at the Broadview police station. The State also contends that the trial court's judgment should be affirmed because defendant made the incriminating statement after Ward-Hudson informed defendant that an attorney had been to the police station to see him. Again, we must reject the State's contentions.

The fact that defendant was not being interrogated at the precise time Nocita arrived at the Broadview police station carries no legal significance for purposes of determining whether defendant made a knowing and intelligent waiver of his constitutional rights under our state's constitution. Defendant's constitutional rights were violated when the officers at the Broadview police station denied defendant access to Nocita, who was physically present at the police station and ready to counsel defendant.

Moreover, this violation was not cured when Ward-Hudson read defendant his *Miranda* rights and informed defendant that, hours before, an attorney had been to the police station to see defendant and that she could make arrangements for him to call the attorney. First, there is no evidence in the record indicating that Ward-Hudson told defendant that Nocita had been sent to the police station by defendant's girlfriend, Alicia May. If defendant had been aware of this fact, he might have refused to make any further statements until he was allowed to speak to Nocita. In this regard, the supreme court in *McCauley* stated:

" '*Miranda* warnings refer only to an abstract right to counsel. That a suspect validly waives the presence of counsel "only means that for the moment the suspect is foregoing the exercise of that conceptual privilege ***. To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an

identified attorney actually available to provide at least initial assistance and advice ***. A suspect indifferent to the first offer may well react quite differently to the second." ' [Citation.]" *McCauley*, 163 Ill. 2d at 445.

Second, the police conduct here is not merely a failure to supply general information, but a failure to apprise defendant of communications from his attorney bearing directly on the right to counsel. In fact, the record demonstrates that the State Police actions were deceitful. The record shows that Delaney never showed defendant or the ASA the note that Nocita left for defendant at the police station. In addition, Ward-Hudson testified that Delaney never showed her the note. Rather, Delaney testified that shortly after he received the note, he disposed of it. Nocita gave uncontested testimony that the note informed defendant that he should not make any statements until his counsel was present.

The police conduct in denying defendant access to Nocita, who was physically present at the police station, and then not allowing defendant to read the note the attorney left for him denied defendant information necessary to knowingly and intelligently waive his constitutional rights. The police conduct violated defendant's privilege against self-incrimination as well as his right to due process.

Moreover, the supreme court's decision in *Smith* demonstrates that the constitutional violations were not cured when defendant was allegedly given Nocita's business card. As an initial matter, we note that the record indicates that defendant never actually received Nocita's business card. Ward-Hudson testified that when she went to the holding cell to speak with defendant, she did not show him Nocita's business card, she only informed defendant that earlier that afternoon an attorney had been to the Broadview police station to see him.

*Smith* addressed the issue of whether a custodial suspect's statements were properly suppressed as violative of the right to counsel during a custodial interrogation. In *Smith*, the defendant was arrested and charged with murder and armed robbery on September 1, 1978. On the morning of September 2, defendant met with an attorney who agreed to represent defendant. *Smith*, 93 Ill. 2d at 181. Later that day, the attorney telephoned his partner and asked her to consult with defendant at the jail. The partner arrived at the jail at approximately 3 p.m., on September 2. The partner was told by an employee at the jail that she could not see defendant because he was experiencing heroin withdrawal. *Smith*, 93 Ill. 2d at 183. The partner then asked the employee to give defendant her business card, on which she had written that she was a partner of the attorney that defendant had spoken to earlier and that defendant should not provide any state-

ments to the police without the presence of one of his attorneys. The defendant received the business card but was not told of the partner's request to see him. *Smith*, 93 Ill. 2d at 183. On September 3, the defendant gave an incriminating statement confessing to murder. The *Smith* court found that defendant did not knowingly and intelligently waive his right to counsel since the police interfered with his attorney's attempts to consult with him. *Smith*, 93 Ill. 2d at 186.

In *Smith*, similar to the present case, the State argued that defendant's waiver of right to counsel was knowing and intelligent since defendant had received the partner's business card. The *Smith* court rejected the State's argument, stating:

"[W]ithout [defendant] being informed that [the partner] had also requested to confer with him, the card and message were of little value. Simply receiving the card easily could have led the defendant to believe his lawyers were too busy that weekend to consult with him in person or were disinterested in his case or welfare. Receiving the card and no more would have chagrined and disappointed the defendant in the character of representation he was receiving from those who he believed were his attorneys. Accepting the State's argument would, as the defendant observes, permit police to isolate a suspect from his counsel and regulate or determine what information or advice a suspect is to receive." *Smith*, 93 Ill. 2d at 189-90.

Such incommunicado interrogation as mentioned in *Smith* is exactly what occurred in the present case. The record shows that the police interrogated defendant while denying him access to his attorney. The officers also prevented defendant from reading the note the attorney left for him at the police station and the officers prohibited defendant from making any telephone calls. Incommunicado interrogation and the surrounding coercive environment likely to result from this objectionable practice is precisely the type of scenario previously condemned by the United States Supreme Court in *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964), and *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). See *McCauley*, 163 Ill. 2d at 424. In sum, we find that a custodial suspect's state constitutional rights to due process and against self-incrimination under sections 2 and 10 of article I of the Illinois Constitution of 1970 are violated where an attorney who is physically present at the place the custodial suspect is being held is denied access to the custodial suspect or where authorities prevent a custodial suspect from receiving written communications from an attorney that directly relate to the custodial suspect's right to counsel.

## II. Conclusion

Accordingly, for the reasons set forth above, we reverse defendant's

conviction and remand for a new trial. Since we have decided that this case should be retried, we will not address defendant's contentions regarding the prosecutor's rebuttal closing arguments or the issues pertaining to defendant's enhanced sentence.

Reversed and remanded.

HOFFMAN and WOLFSON, JJ., concur.